SANTA ANA WATER CO. v. TOWN OF SAN BUENAVENTURA et al.

(Circuit Court, S. D. California. May 29, 1893.)

1. WATER COMPANIES—RATES—CONTRACTS WITH TOWN.
    Act Cal. March 10, 1866, § 12, incorporating the town of S., conferred on the trustees of the town power to provide for the prevention and extinguishment of fires, and to supply it with fresh water. Section 14 provides that they should have no power to contract debts in excess of $400, unless an amount of money sufficient to meet them was actually in the treasury, unappropriated to other purposes. *Held,* that the trustees might make such contract as they deemed expedient with individuals who would undertake to furnish a supply of water; and a provision in such contract that such individuals should have the unrestrained right to fix the rates to be charged for water furnished, so long as the same were general, is valid.

2. SAME—ASSIGNMENT—CORPORATIONS.
    This right to fix rates was conferred on the individuals in question as "parties of the first part" to the contract. They afterwards assigned all their rights and privileges under the contract to a water company duly organized under the general law, and this assignment was ratified by an ordinance of the town. The new company completed the work, and fulfilled all the obligations of the first party to the contract. *Held,* that the right to fix rates passed to the company, as a right growing out of a valid contract, and it is not affected by, or subject to, the power reserved to the legislature to alter or repeal any provisions of the company's charter, which also provided a mode for fixing rates.

3. SAME—CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS.
    Const. Cal. 1879, art. 14, § 1, which provides that thereafter the rates for water shall be fixed annually by the governing board of the city or town in which it is furnished, and the legislation enacted for the purpose of carrying it into effect, are unconstitutional and void as to a contract made before the adoption of the constitution, which confers on the water company the sole right to fix rates, for they impair the obligation of the contract. New Orleans Gas Co. v. Louisiana Light, etc., Co., 6 Sup. Ct. Rep. 252, 115 U. S. 650, followed.

4. SAME—ACT OF INCORPORATION.
    Act Cal. May 3, 1852, which provides that any contract made between a city and a water company organized under that act, for a supply of water, "shall be valid and binding in law, but shall not take from the city the right to regulate the rates for water," has no application to a contract made for the same purpose with individuals not organized under this act.

5. SAME—CORPORATIONS—SPECIAL ACTS—ASSIGNMENT OF FRANCHISE.
    Const. Cal. 1849, art. 4, § 31, which declares that "corporations may be formed under general laws, but shall not be created by special act," does not prohibit the assignment of a franchise to a legally-organized corporation by persons having the lawful right to exercise and transfer the same. People v. Stanford, 18 Pac. Rep. 85, 19 Pac. Rep. 693, and 77 Cal. 371, followed.

In Equity.    Suit by the Santa Ana Water Company against the town of San Buenaventura and others.    Heard on demurrer to the bill.    Demurrer overruled.

W. H. Wilde and Wilson & Lamme, for complainant.

Blackstock & Shepherd and George J. Denis, for defendants.

ROSS, District Judge.    The grounds of the demurrer which has been interposed to the bill in this case are—First, that the court has no jurisdiction of the subject-matter of the suit, or of the parties to it; and, second, that the bill is without equity.

For the purposes of the present decision the allegations of the bill are, of course, to be taken as true.    It appears therefrom that the defendant corporation is a municipal corporation created by an act of the legislature of the state of California, entitled "An act to incorporate the town of San Buenaventura," approved March 10, 1866, (St. 1866, p. 216,) by which the officers of the town were made to consist of a board of five trustees to be elected by the qualified voters of the town, a treasurer, a clerk, a marshal, a surveyor, and an attorney.    It was provided by the act that the board of trustees should have power to make regulations for securing the health, cleanliness, and good order of the town; to provide for the extinguishment of fires; and to supply the town with fresh water. This act was subsequently amended, but in no particular important to be noticed here.

At the time of the incorporation of the town it had no system of water supply, nor had it any such system when, on the 7th day of December, 1868, there was presented to the board of trustees a petition by Jose de Arnaz, Victor Ustassaustegui, and Francisco Molleda, asking for an exclusive privilege, for the term of 50 years, to supply the town with water for household, municipal, and irrigation purposes, and for the extinguishment of fires, upon terms and conditions upon which those parties then offered to construct a water system to supply the town with water.    Upon the receipt of the petition the board of trustees, in order to better inform themselves as to the expediency of granting it, appointed three disinterested citizens of the town as commissioners "to examine into the better way and utility of bringing water into said town," with instructions to report to the board on the 12th day of December, 1868, in respect to the advisability of granting to the petitioners the rights and franchises asked for.

On the 12th day of December, 1868, the board of trustees met in their council chamber in the town, pursuant to adjournment, at which time and place they proceeded to examine into the matter of the petition of Arnaz and his associates.    The report of the commissioners, which was favorable to the granting of the petition, was received and examined, and after due consideration of the matter the board agreed to enter into an agreement with Arnaz and his associates, granting to them the franchise, rights, and privileges, subject to the terms and conditions of a contract to be drawn and executed by the respective parties.    Subsequently, and at a regular

meeting of the board held in the council chamber on the 4th day of January, 1869, there was presented to the board for its consideration a written contract between the town and Arnaz and his associates, which contract was by the board examined and considered; and thereupon the board, by a resolution passed and spread upon its minutes, authorized and directed the president of the board and the clerk of the town to sign and execute the contract in the name, and as the act and deed, of the town, and at the same time and place the board also passed an ordinance, section 1 of which is as follows:

"Section 1. The board of trustees of the town of San Buenaventura grant from this date the exclusive privilege of supplying water to the said town unto Jose de Arnaz, Victor Ustassaustegui, and Francisco Molleda, for the term of fifty years, counting from this date; and the president and secretary of said board are ordered to sign a legal contract with the said interested parties, conceding to them the said privilege for the said term of fifty years, according to a resolution passed by this board, and entered on the minutes of our proceedings, the 12th day of December, A. D. 1868."

On the same day, to wit, January 4, 1869, there was executed by and on behalf of the respective parties the contract in writing, by which Arnaz and his associates agreed to cause a dam to be built at a proper point in the San Buenaventura river, and by means of a flume, ditch, or pipe, at their option, within two years from the date of the contract, to introduce a sufficient supply of water for the use of the town, and by which the town, in consideration of the risk and expense to be incurred by Arnaz and his associates in the undertaking, granted to them, their successors and assigns, the free use of the streets and public grounds of the town for the laying of the necessary pipes, "exclusively," provided that Arnaz and his associates should furnish a sufficient supply of water for public use in case of fire, without charge, and for such public fountains as may be established by the authorities of the town, at such rates as may be agreed upon between the respective parties; "also, that the parties of the first part [Arnaz and his associates] shall have the unrestrained right to establish such rates for the supply of water to private persons as they may deem expedient, provided that such rates be general." It was further provided in and by the contract that the town should have the right, at the termination of 50 years, to purchase the works erected by Arnaz and his associates, or their assigns, at a fair valuation, and that, within the term of 1 year from the date of the contract, Arnaz and his associates should commence the erection of the necessary works, and finish the same within 2 years from the date of the contract.

Within a year after the execution of the contract, Arnaz and his associates, under and by virtue of it, constructed a dam in the San Buenaventura river, and constructed ditches leading therefrom, by means of which they diverted the water of the river, and conducted it to the town, and therein built and constructed conduits in the streets of the town, and therefrom supplied the inhabitants with water, and provided water for the use of the town, and for the extinguishment of fires, and within two years after the date of

the contract completed a water system, in all things, in compliance with the provisions of the contract, and whereby they supplied water to the town for all municipal purposes, and supplied the inhabitants thereof with water for domestic use, irrigation, and all other purposes for which water is commonly used by the inhabitants of a community.

On the 15th day of January, 1870, the complainant, the Santa Ana Water Company, was incorporated under an act of the legislature of the state of California entitled "An act for the incorporation of Water Companies," approved April 22, 1858, (St. 1858, p. 218,) and ever since then has been, and now is, a corporation existing and doing business in California, and having its principal place of business in the town of San Buenaventura; and, to this corporation, Arnaz and his associates, on or about the 26th day of January, 1871, sold and assigned their dams, ditches, conduits, water rights and privileges, and all their right, title, and interest in and to the waterworks and system by which the town of San Buenaventura was then supplied with water, together with all the rights, privileges, and franchises obtained and held by them under and by virtue of the aforesaid contract with the town. On or about the 28th day of October, 1872, the board of trustees of the town passed an ordinance approving and ratifying the transfer of the property and rights from Arnaz and his associates to the complainant corporation, sections 1 and 2 of which ordinance are as follows:

"Section 1. All the rights and privileges heretofore granted unto the said Arnaz, Ustassaustegui, and Molleda be, and the same are hereby, continued and granted the Santa Ana Water Company, for fifty years from and after January 4, A. D. 1869. The transfer and assignment by said Arnaz, Ustassaustegui, and Molleda of said water company is hereby ratified and approved. Sec. 2. The Santa Ana Water Company is hereby granted the exclusive right and privilege of laying all such main and service pipes in and through the several streets of the town of San Buenaventura, by such means and in such manner as said water company shall elect, for the purposes set forth in the certificate of incorporation of said company, and all other lawful purposes, for the said term of years: provided, however, that the main -water pipe be laid in the main street of the town of San Buenaventura on or before July 1, 1873,—and to make, hold, and maintain such aqueducts, dams, ditches, flumes, and reservoirs, for the purposes aforesaid within said town, as shall be necessary: provided, that just compensation shall be made to the owners of private property taken by said company for such public use in the manner prescribed by law, if the parties cannot agree on the value of the same; and, for the protection of the property and works of said company, no person shall, without authority from said company, cut, tap, or otherwise interfere with, any water pipes, ditch, flumes, or reservoirs of said company, or bathe or wash therein, or cut or injure any shade trees planted or to be planted near the same for protection."

By an act of the legislature of the state of California entitled "An act to reincorporate and extend the limits of the town of San Buenaventura, in the county of Ventura, state of California, and also to change the name of Canada street, in said town, to that of Ventura avenue," approved March 29, 1876, (St. 1875-76, p. 534,) the ordinance last mentioned was approved and ratified. By an act of the legislature of the state of California entitled "An

act to create the county of Ventura, to establish the boundaries thereof, and to provide for its organization," approved March 22, 1872, (St. 1872, p. 481,) a certain portion of the county of Santa Barbara, within which was situated the town of San Buenaventura, became, and thereafter was, and now is, the county of Ventura. The complainant corporation laid and completed and utilized its main water pipe in the main street of San Buenaventura before July 1, 1873, and has in all respects kept and performed the covenants of the contract in question.

Complainant was incorporated for the purpose of supplying the town of San Buenaventura, and its inhabitants, with pure, fresh water, for municipal, household, domestic, and other purposes, and since the year 1871 has been continuously, and is now, doing so. It has purchased and obtained extensive riparian rights in and to the waters of the San Buenaventura river, acquired lands, rights of way, and reservoir sites, has built reservoirs, constructed ditches, purchased and laid into a complete system for distribution many miles of mains, pipes, and lateral connections, by means of which it has supplied the town and its inhabitants with water. In acquiring its rights, and in the construction and establishment of its plant, it has expended the sum of $163,000, and the property it has so acquired and built up is of the value of $200,000. In order to procure the funds for the extension and enlargement of the waterworks, and to provide for the natural growth of the town, and the increase in the number of inhabitants, and to provide the increased supply of water necessary therefor, complainant has, during the five years last past, been compelled to borrow, and has borrowed, in addition to amounts of money furnished by the stockholders of the complainant, over $40,000, to secure the payment of which, and the interest thereon, complainant has mortgaged all of its property, rights, and franchises, which mortgage is now a subsisting lien thereon.

The bill alleges that to give complainant a just and reasonable compensation for the service rendered, to provide for the necessary and usual wear and tear and repairs, to maintain and operate its plant, and to give to its stockholders a just and reasonable return upon the capital invested, complainant should make its rates and charges for water supplied to the town and its inhabitants so as to produce a present income of $25,000 per annum. That pursuant to the provisions of an act of the legislature of the state of California entitled "An act to enable the board of supervisors, town council, board of aldermen, or other legislative body of any city and county, city or town, to obtain data and information from any corporation, company, or person supplying water to such city and county, city or town, requiring such board, town council, or other legislative body, to perform the duties prescribed by section 1 of article 14, of the constitution, and prescribing the performance or nonperformance of such duties," approved March 7, 1881, (St. 1881, p. 54,) the board of trustees requested complainant to furnish to the board, in the month of January, 1892, the detailed and verified statement prescribed in section 2 of that act of

the legislature. That thereafter, to wit, on or about the 30th day of January, 1892, the complainant, in compliance with that request, and with said section 2 of the act, furnished the board, and filed with its clerk, a detailed statement, verified by the oath of the president and secretary of complainant corporation, showing the name of each water-rate payer, his or her place of residence, the amount paid by each such water-rate payer during the year preceding the date of such statement, and also showing all revenue derived by complainant from all sources during that year, and an itemized statement of expenditures made by complainant for supplying water during that time. That from said statement it appeared, and so the fact is, that the receipts and expenditures made by complainant in and about the furnishing and supplying of water during the year were as follows, to wit:

"Receipts.

| | |
|---|---|
| From water rates | $12,054 82 |
| From all other sources | 1,061 69 |
| Total receipts for year | $13,116 51 |

"Disbursements.

| | |
|---|---|
| For interest on indebtedness | $ 2,468 16 |
| For taxes | 786 39 |
| For operating expenses and repair | 4,203 60 |
| For dividends to stockholders | 5,500 00 |
| | $12,958 15 |
| Expended in construction in extending system | 1,688 99 |
| Disbursements over receipts | 1,530 83" |

That on or about the 15th day of February, 1892, the defendant board of trustees of the town assumed to pass, and did pass, an ordinance purporting to fix the maximum rates for supplying water to the town and its inhabitants, which should be charged by complainant for the year beginning July 1, 1892, and ending June 30, 1893, a copy of which ordinance is annexed to, and made a part of, the bill. That according to the best information and belief of the complainant the amount of money that will be required during the year beginning July 1, 1892, and ending June 30, 1893, to meet and pay the interest on its bonded and other indebtedness, state, county, and municipal taxes, the necessary repairs to maintain its property in good order and condition, and to provide for its operating and other necessary expenses, will exceed the sum of $9,000. That if the rates for supplying water to the town and its inhabitants are to be made as in the last-mentioned ordinance specified, the aggregate amount of money that could be collected from the town and its inhabitants for that year would not amount to over $8,500,—an amount insufficient to provide for the cost of maintenance, taxes, and operating expenses,—and that, upon the basis of the rates for supplying water specified in the ordinance, complainant would be deprived of all net income, or power to pay its stockholders any dividend upon its capital stock, and the owners of the stock would be deprived of all income and revenue from their said property.

The bill alleges that the board of trustees of the town asserts its right to fix the charges that complainant shall make for water furnished to the town and its inhabitants by virtue of section 1 of article 14 of the constitution of the state of California, and by virtue of the aforesaid act of the legislature of the state of California, approved March 7, 1881, the provisions of which, the complainant alleges, are inapplicable to complainant, whose charges for water so supplied, it is averred, should be fixed and determined as provided for in the contract made between the town and Arnaz and his associates, and by them assigned to complainant; and the purpose of the suit is to obtain a decree of this court so adjudging.

Section 1 of article 14 of the present constitution of California, adopted in 1879, is as follows:

"The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law: provided, that the rates or compensation to be collected by any person, company, or corporation in this state for the use of water supplied to any city and county, or city or town, or the inhabitants thereof, shall be fixed, annually, by the board of supervisors, or city and county or city or town council, or other governing body of such city and county, or city or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year, and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Any board or body failing to pass the necessary ordinances or resolutions fixing water rates, where necessary, within such time, shall be subject to peremptory process to compel action, at the suit of any party interested, and shall be liable to such further processes and penalties as the legislature may prescribe. Any person, company, or corporation collecting water rates in any city and county, or city or town, in this state, otherwise than as so established, shall forfeit the franchises and waterworks of such person, company, or corporation to the city and county, or city or town, where the same are collected, for the public use."

It was to carry out these provisions of the constitution that the legislature of the state passed the act approved March 7, 1881, and it was in pursuance of these constitutional and statutory provisions that the ordinance complained of was enacted.

It is clear that if the contract entered into between the town and Arnaz and his associates, purporting to confer upon them and their assigns the exclusive privilege of supplying the town and its inhabitants with water for 50 years from the date of its execution, and to secure to them "the unrestrained right to establish such rates for the supply of water to private persons as they may deem expedient, provided that such rates be general," was a valid contract, and passed by assignment to the complainant corporation, the obligation of that contract was protected by the constitution of the United States against impairment by any act of the state, constitutional or statutory. New Orleans Gas Co. v. Louisiana Light, etc., Co., 115 U. S. 650, 6 Sup. Ct. Rep. 252; Waterworks Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. Rep. 273. The acts complained of were done under and pursuant to a provision of the state constitution, supplemented by state legislation. Whether or not

the acts so done were in violation of the constitution of the United States necessarily presents a federal question, of which this court has jurisdiction.

The provisions of the constitution of California in respect to the formation of corporations, and the organization of cities and incorporated villages in existence at the time of the incorporation of the town of San Buenaventura, and at the time of the making of the contract between that town and Arnaz and his associates, and at the time of its assignment to the complainant corporation, were as follows:

"Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered from time to time, or repealed." Section 31, art. 4, Const. 1849.

"It shall be the duty of the legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessment and in contracting debts by such municipal corporations." Section 37, Id.

Pursuant to these provisions of the constitution of the state the legislature of California passed an act, approved March 10, 1866, incorporating the town of San Buenaventura, by the twelfth section of which the board of trustees of the town was given power, among other things, to provide for the prevention and extinguishment of fires, and to supply it with fresh water. By the fourteenth section of the act it was declared that the trustees "shall have no power to borrow money, nor to contract any debts or liabilities which shall, in the aggregate, exceed the sum of four hundred dollars, unless it shall first appear by the returns of the treasurer that there is actually in the treasury money, not otherwise appropriated, sufficient to meet and pay such liabilities." The power conferred by the legislature upon the board of trustees of the municipality to provide for the prevention and extinguishment of fires, and to provide the town with fresh water, necessarily carried with it the implied power to make any and all proper contracts to accomplish those ends. There was no constitutional inhibition against such grant of power, and it was therefore not only within the province of the legislature to make the grant, but, having deemed it wise to make of the town a municipal corporation, it was appropriate, and, indeed, necessary, that provision either be made directly by the legislature for the supply of the town and its inhabitants with fresh water, or that such power be delegated to the governing body of the municipality; which was done in and by the twelfth section of the act. That the legislature contemplated that the power thus conferred upon the municipality should be exercised by means of a contract or contracts is shown by the fact that the town itself was, by the fourteenth section of the act incorporating it, denied the power to borrow money or to contract any debts or liabilities exceeding in the aggregate four hundred dollars, unless there should be in the treasury money, not otherwise appropriated, sufficient to pay such liabilities, and by the further fact that there were then existing laws enacted by the legislature, as will presently be shown,

providing for the organization of corporations for the supplying of cities and towns, with their consent, with fresh water, and conferring upon such corporations the same privileges, immunities, and franchises that should be granted to any individual or individuals. Whether or not the board of trustees was authorized, in view of other provisions of the statutes of the state, to confer, by contract, on any individual, individuals, or corporation, the exclusive privilege of supplying the town and its inhabitants with water, is not here involved. That feature of the contract in question need not, therefore, be considered. No third party is asserting the right to introduce water into the town, nor is the town itself proposing to provide a supply. The question here concerns only that feature of the contract reserving to Arnaz and his associates "the unrestrained right to establish such rates for the supply of water to private persons as they may deem expedient, provided that such rates be general," and the effect of the assignment of the contract to the complainant corporation.

The complainant was organized, as has been said, under the provisions of an act of the legislature of California, approved April 22, 1858, which was a general law passed for the incorporation of water companies. That act declared that any company organized under it should furnish pure, fresh water to the inhabitants for family uses, so long as the supply permitted, at reasonable rates, and without distinction of persons, upon proper demand therefor, and should furnish water, to the extent of its means, to the city and county, "in case of fire or other great necessity, free of charge." The act further declared that the rates to be charged for water should be determined by a board of commissioners, to be selected as follows: Two by the city and county, or city or town, authorities, and two by the water company, and, in case the four could not agree to the valuation, then and in that case the four should choose a fifth person, and he should become a member of the board, and, if the four commissioners could not agree upon a fifth, then the sheriff of the county should appoint him, and that the decision of a majority of the board should determine the rates to be charged for water for one year, and until new rates should be established. The act also declared that the corporation should have the right, subject to the reasonable direction of the city or town authorities as to the mode and manner of exercising it, to the use of so much of the streets, ways, and alleys of the municipality as might be necessary for laying its pipes for conducting water.

In the case entitled Spring Valley Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. Rep. 48, the question arose whether the right conferred upon water companies organized under that act to participate in the fixing of the rates to be charged for water furnished by them constituted a contract protected by the constitution of the United States against impairment by subsequent action of the state. The court held that the provision in the statute of 1858 in respect to the fixing of water rates was but one of the corporate privileges granted by the state; that it was part and parcel of the charter of the corporation, and nothing else, and therefore fell within the

power reserved by section 31 of article 4 of the constitution of the state, in existence when the act was passed, to alter or repeal it. Chief Justice Waite, in delivering the opinion of the court, said:

"The organization of the Spring Valley Company was not a business arrangement between the city and the company, as contracting parties, but the creation of a new corporation to do business within the state, and to be governed as a natural person or other corporations were or might be. Neither are the charter rights acquired by the company under the law to be looked upon as contracts with the city and county of San Francisco. The corporation was created by the state. All its powers came from the state, and none from the city and county. As a corporation it can contract with the city and county in any way allowed by law, but its powers and obligations, except those which grow out of contracts lawfully made, depend alone on the statute under which it was organized, and such alterations and amendments thereof as may from time to time be made by proper authority. The provision for fixing rates cannot be separated from the remainder of the statute by calling it a contract. It was a condition attached to the franchises conferred on any corporation formed under the statute, and indissolubly connected with the reserved power of alteration and repeal."

It will be observed that while the court held that each and every right conferred by the statute under which the company was incorporated was a part and parcel of its charter, and that only, and therefore subject to alteration or repeal, the right of any company to contract with the city or town in any way allowed by law was expressly recognized and declared. It has already been seen that in the act incorporating the town of San Buenaventura the legislature conferred upon the board of trustees of the town the power to provide for the prevention and extinguishment of fires, and to provide for the supplying of the town and its inhabitants with fresh water, and that the only limitation upon that power was that the board should have no power to borrow money, or to contract debts or liabilities, to exceed in the aggregate $400, unless there should be at the time money in the treasury, not otherwise appropriated, sufficient to pay such debts or liabilities. Not only was this no limitation upon the power of the board of trustees to contract with other parties for the introduction, at their expense, of water into the town; but, practically, it made it a matter of necessity for the board to make some contract with some individual, individuals, or corporation to that end, since it was denied the power to incur any debts or liabilities exceeding in the aggregate $400, without the money in hand to pay them.

Arnaz and his associates were individual citizens. They were not in any way bound to enter into the contract with the board of trustees of the town. By the exercise of none of its prerogatives as a governing power could the municipality compel them to do so. The contract required their assent, as well as that of the board of trustees. Of course, in entering into it, they did so subject to existing laws; but no then existing law has been pointed out, reserving to the state or the municipality the power to fix the water rates the town, through its board of trustees, contracted should be fixed by Arnaz and his associates. A statute of the state, approved May 3, 1852, (St. 1852, p. 171,) providing for the incorporation of water companies, declared, in its third section:

"This act shall not give to any company the right to supply any city with water unless it shall be previously authorized by an ordinance, or unless it be done in conformity with a contract entered into between the city and the company. Any contracts hereafter so made shall be valid and binding in law, but shall not take from the city the right to regulate the rates for water, nor shall any exclusive right be granted, by contract or otherwise, for a term exceeding twenty years."

By this act it was declared, as will be observed, that no contract entered into between a city and a company incorporated under the provisions of the act should "take from the city the right to regulate the rates for water." That provision had no application to Arnaz and his associates, for the reason that they were not incorporated under that or any other act.

The doctrine is firmly established that the state may, by contract, restrict the exercise of some of its most important powers. Many of the cases holding that doctrine are referred to in New Orleans Gas Co. v. Louisiana Light, etc., Co., supra. In that case the supreme court sustained a grant by the legislature of Louisiana of an exclusive right to supply gas to the city of New Orleans and its inhabitants, and held that the grant was protected by the contract clause of the constitution of the United States against impairment by a subsequent change in the constitution of Louisiana. In the course of its opinion the court said:

"We have seen, the manufacture of gas, and its distribution for public and private use by means of pipes laid, under legislative authority, in the streets and ways of a city, is not an ordinary business, in which every one may engage, but is a franchise belonging to the government, to be granted for the accomplishment of public objects, to whomsoever, and upon what terms, it pleases. It is a business of a public nature, and meets a public necessity, for which the state may make provision. It is one which, so far from affecting the public injuriously, has become one of the most important agencies of civilization, for the promotion of the public convenience and the public safety. It is to be presumed that the legislature of Louisiana, when granting the exclusive privileges in question, deemed it unwise to burden the public with the cost of erecting and maintaining gas works sufficient to meet the necessities of the municipal government and the people of New Orleans, and that the public would be best protected, as well as best served, through a single corporation, invested with the power, and charged with the duty, of supplying gas of the requisite quality, and in such quantity as the public needs demanded. In order to accomplish that, in its judgment, the public welfare required, the legislature deemed it necessary that some inducement be offered to private capitalists to undertake, at their own cost, this work. That inducement was furnished, in the grant of an exclusive privilege of manufacturing and distributing gas by means of pipes laid in the streets of New Orleans for a fixed period, during which the company would be protected against competition from corporations or companies engaged in like business. Without that grant it was inevitable either that the cost of supplying the city and its people would have been made, in some form, a charge upon the public, or the public would have been deprived of the security in person, property, and business which comes from well-lighted streets. It is not our province to declare that the legislature unwisely exercised the discretion with which it was invested. Nor are we prepared to hold that the state was incapable, her authority in the premises not being, at the time, limited by her own organic law, of providing for supplying gas to one of her municipalities and its inhabitants by means of a valid contract with a private corporation of her own creation."

The subsequent case of Waterworks Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. Rep. 273, involved the validity and effect of a contract between the city of New Orleans and the New Orleans Water

Company, whereby the former, acting under legislative authority, granted to the latter, for the term of 50 years, the exclusive privilege of supplying that city and its inhabitants "with water from the Mississippi, or any other stream or river, by mains or conduits, and for erecting and constructing any necessary works or engines or machines for that purpose." Subsequently, under the sanction of a new state constitution, adopted after that contract was made, the city passed an ordinance allowing Rivers, or the lessee of the St. Charles Hotel, the right of way and privilege to lay a water pipe from the Mississippi river, at any point opposite the head of Common or Gravier streets, through either of those streets, to convey water to that hotel. The supreme court held the grant to Rivers to be inconsistent with the previous one to the waterworks company, and that the provision in the new constitution of Louisiana, and the ordinance under which Rivers proceeded, impaired the obligation of the city's contract with the waterworks company. It was said:

"The right to dig up and use the streets and alleys of New Orleans for the purpose of placing pipes and mains to supply the city and its inhabitants with water is a franchise belonging to the state, which she could grant to such persons or corporations, and upon such terms, as she deemed best for the public interests. And as the object to be attained was a public one, for which the state could make provision by legislative enactment, the grant of the franchise could be accompanied with such exclusive privileges to the grantee, in respect of the subject of the grant, as, in the judgment of the legislative department, would best promote the public health and the public comfort, or the protection of public and private property. Such was the nature of the plaintiff's grant, which, not being at the time prohibited by the constitution of the state, was a contract, the obligation of which cannot be impaired by subsequent legislation, or by a change in her organic law;" the constitutional prohibition upon state laws impairing the obligation of contracts not, however, restricting "the power of the state to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of said contract," because "rights and privileges arising from contracts with a state are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense as are all contracts and all property, whether owned by natural persons or corporations."

The principle controlling the decisions cited is a just and plain one. The duty is imposed upon the legislative power that creates a municipal corporation to provide for the necessary elements of gas and water. It may, at its discretion, do so directly, or it may, in the absence of any constitutional inhibition, say, directly, or through the municipal corporation so created, to its individual citizens, in the language of the supreme court, (Binghamton Bridge, 3 Wall. 74:)

"If you will embark with your time, money, and skill in an enterprise which will accomodate the public necessities, we will grant to you, for a limited period, or in perpetuity, privileges that will justify the expenditure of your money, and the employment of your time and skill."

Such a grant, said the court in the case from which the quotation is taken, "is a contract with mutual considerations, and justice and good policy alike require that the protection of the law should be assured to it."

I am of opinion, therefore, that the contract in question in the present case, in so far as it reserved to the parties of the first part the "unrestrained right to establish such rates for the supply of water to private persons as they may deem expedient, provided that such rates be general," and subject, also, to the implied condition that the rates be reasonable, was a valid contract, in the hands of Arnaz and his associates.

Did their rights in that respect vest by the assignment in the complainant corporation? That any and every right conferred on complainant by its charter may be altered or repealed by the state is put at rest by the decision of the supreme court in Spring Valley Waterworks v. Schottler, *supra,* and is no longer open to question. But that companies incorporated under the act of April 22, 1858, for supplying cities and towns with fresh water, may contract with such cities and counties, or cities or towns, in any way allowed by law, was also declared by the same decision. In People v. Stanford, 77 Cal. 371, 18 Pac. Rep. 85, and 19 Pac. Rep. 693, the supreme court of California decided that that provision of the constitution of the state declaring that "corporations may be formed under general laws, but shall not be created by special act" (article 4, § 31) does not prohibit the assignment of a franchise to a legally-organized corporation by persons having the lawful right to exercise and transfer the same; that that provision of the constitution of the state applies to the formation or creation of corporations, and to the powers directly conferred upon them by legislative enactment. The construction placed upon the constitution of the state by the highest court in existence under it is binding on this court, and under the construction thus adopted by the supreme court of California it is obvious that the complainant corporation was competent to take by assignment whatever rights the contract of January 4, 1869, conferred upon Arnaz and his associates, and that were assignable by them.

The point is made on behalf of the defendants that by the terms of the contract the right to establish rates was a right personal to Arnaz and his associates. The contract does not fairly admit of such construction. That right is reserved to "the parties of the first part" to the contract, which in terms provides for its assignment. The grant of the use of the streets, etc., for the necessary purposes of the undertaking, is made to the parties of the first part, their successors or assigns; and the right is by the contract reserved to the town to purchase, at the expiration of 50 years, the works erected by the parties of the first part, or their assigns, at a fair valuation. By the terms of the contract the parties supplying water under it are required to furnish sufficient water for public use in case of fire, without charge, and for such public fountains as should be established by the authorities of the town, at rates to be agreed upon by the parties; that is to say, by the parties furnishing the water, on the one part, and the town authorities, on the other. And to the parties of the first part—that is to say, to the parties furnishing the water—is given the right to establish the rates for water supplied to private per-

sons. This, manifestly, is the fair and true interpretation of the contract; and that. such was the understanding of it on the part of the board of trustees of the town is shown by the fact that after its assignment to the complainant corporation, and on the 28th day of October, 1872, the board of trustees enacted an ordinance ratifying and approving the assignment, the first section of which is as follows:

"All the rights and privilege heretofore granted to the said Arnaz, Ustussaustegui, and Molleda be, and the same are hereby, continued and granted to the said Santa Ana Water Company, for fifty years from and after January 4th, A. D. 1869. The transfer and assignment by said Arnaz, Ustussaustegui, and Molleda of said franchise to said water company is hereby ratified and approved."

And this ordinance of the town was approved, ratified, and continued in force by an act of the legislature of the state entitled "An act to incorporate and extend the limits of the town of San Buenaventura, in the county of Ventura, state of California, and also to change the name of Canada street, in said town, to that of Ventura avenue," approved March 29, 1876.

Under the views above expressed it becomes unnecessary to consider the objections made to the constitutionalty of the ordinance in question, based on the ground that its enforcement would prevent the stockholders of the complainant corporation from receiving any interest or dividends on their investments. Demurrer overruled, with leave to defendants to answer within the usual time.