LOS ANGELES CITY WATER CO. et al. v. CITY OF LOS ANGELES et al.

(Circuit Court, S. D. California. May 31, 1898.)

No. 734.

1. WATER COMPANIES—CONTRACT WITH MUNICIPAL CORPORATION—REGULATION OF RATES.

A provision in a contract between a water company and a municipal corporation that the mayor and common council "shall have, and do reserve, the right to regulate the water rates charged by said parties of the second part, or their assigns," except that they shall not reduce the same below a stated price, refers, not to a right of regulation given the city by the contract itself, but to a power which the city already had, or which might be conferred by legislative action; and, if the city was authorized to make the stipulation in respect to minimum rates, neither

it nor the legislature could thereafter lawfully reduce rates below the minimum.

**2. MUNICIPAL CORPORATIONS—EXTENT OF POWERS.**

Municipal corporations possess the following powers, and no others: (1) Those granted in express words; (2) those necessarily or fairly implied in, or incident to, the powers expressly granted; (3) those essential to the declared objects and purposes of the corporation,—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of the power is resolved against the corporation.

**3. SAME—CONTRACTS AS TO WATER WORKS.**

Charter authority "to provide for supplying the city with water" gives the city power to contract with a water company in respect to rates to be charged to consumers.

**4. SAME.**

Even if the power of a city to regulate water rates is legislative or governmental, and not a special legislative grant for private purposes, the city may still, by contract, abridge such power, under an implied as well as an express legislative grant.

**5. SAME—REASONABLENESS OF CONTRACT.**

In determining the question whether a contract between a city and a water-works company was reasonable, the contract should be construed, not in the light of subsequent developments and newly arising conditions, but with reference to the conditions surrounding the parties at the date of the contract.

**6. SAME—LEASE OF WATER WORKS.**

A contract by the city of Los Angeles in 1868 to lease its water works for a period of 30 years, in consideration of a rental of $1,500 annually, and the cancellation of certain large claims of the lessees against the city, —the lessees to furnish water for all public and municipal uses free of charge, and to extend pipes and mains to answer all the needs of the inhabitants,—*held*, a reasonable contract, binding upon the municipality.

**7. SAME—POWER TO REGULATE WATER RATES.**

The California statute of May 3, 1852 (St. Cal. 1852, p. 171), providing for the incorporation of water companies, and which contains a provision preventing any municipality from depriving itself, by contract with such corporation, of the power to regulate water rates, does not affect the power of a municipality to limit its rights in this respect by a contract granting a water-works franchise to individuals, as distinguished from a corporation organized under the act; nor is its power to so bind itself affected by the fact that such individuals intend to organize a corporation, and assign their franchise to it.

**8. SAME—LEGISLATIVE RATIFICATION OF CONTRACT.**

Whatever a legislature may originally authorize a municipal corporation to do, it may, if the state constitution interposes no obstacle, subsequently ratify; and such ratification is equivalent to an original grant of power, operative, by relation, as of the date of the thing ratified.

**9. SAME—DECLARATIONS OF MUNICIPAL OFFICERS.**

A municipal corporation is bound by the declarations of its officers, where such declarations accompany, and are explanatory of, an act done by the officer in the scope of his authority.

**10. SAME—ESTOPPEL.**

Where, by contract between a city and a water-works company, the right of the company to take water from a certain river is limited so as not to exceed a specified amount without the previous consent of the city, a subsequent consent of the city to the taking of a larger quantity cannot be withdrawn during the life of the contract, after large expenditures have been made by the company in reliance upon such consent.

**11. SAME—ORDINANCE REDUCING WATER RATES—ACQUIESCENCE OF COMPANY.**

Where a city, by ordinances passed each year, assumes to regulate the rates to be charged by a water company, acquiescence by the company in the reduction made by one such ordinance is not an acquiescence in the ordinance of the succeeding year.

88 F.—46

12. SAME—INJUNCTION—EQUITY JURISDICTION.

An injunction against the enforcement of an ordinance reducing water rates will not be refused on the theory that the ordinance, if void at all, is void upon its face, and therefore throws no cloud upon complainant's rights, when such invalidity only appears in connection with a certain contract, and with evidence aliunde showing what water rates were charged at the date of such contract.

13. SAME—INJUNCTION—EQUITY JURISDICTION.

An ordinance wrongfully reducing water rates, where the constitution and laws of the state apparently denounce severe pains and penalties upon collections of higher rates than those prescribed by the ordinance, so affects the water company's property rights, and hinders it in the collection of its lawful compensation, that equity will afford protection against such an ordinance, even though the city is taking no active steps to enforce it.

14. SAME—EFFECT OF APPEAL.

Where a city annually passes ordinances regulating water rates for each year, an injunction against such an ordinance, which is illegal, will not be denied merely because the particular ordinance in question would necessarily expire before an appeal from a decree awarding the injunction could be disposed of.

White & Monroe and J. S. Chapman, for complainants.
W. E. Dunn and Lee & Scott, for defendants.

WELLBORN, District Judge. This suit, which is now under submission on the pleadings and an agreed statement of facts, was brought to annul an ordinance of the council of the city of Los Angeles adopted February 23, 1897, fixing water rates during the year commencing July 1, 1897, and ending June 30, 1898, on the ground that said ordinance impairs the obligation of the contract hereinafter mentioned, and is therefore repugnant to the constitution of the United States. The material facts of the case are these:

On July 22, 1868, the city of Los Angeles, as party of the first part, and John S. Griffin, P. Beaudry, and Solomon Lazard, as parties of the second part, entered into a contract whereby said city, for the considerations below indicated, leased its water works to said Griffin, Beaudry, and Lazard, and their assigns, for a term of 30 years, with the right to lay pipes in the streets, and sell and distribute water for domestic purposes to the inhabitants of said city, and to receive the profits thereof, and with the additional right to take water from the Los Angeles river at a point at or above the present dam: provided, that the said parties of the second part should at no time take from said river, for the use of said water works, more than 10 inches of water without the previous consent of the mayor and common council of said city, and that they would within 60 days from the date of the contract select the point where the water should be taken from said river; and the city bound itself not to make any other lease, sale, contract, grant, or franchise to any person, corporation, or company for the sale or delivery of water to the inhabitants of said city for domestic purposes during the continuance of the contract, and reserved the right to regulate water rates, as follows:

"Always provided that the mayor and common council of said city shall have, and do reserve, the right to regulate the water rates charged by said parties of the second part, or their assigns: provided, that they shall not so

reduce such water rates, or so fix the price thereof, to be less than those now charged by the parties of the second part for water."

For the lease and grants aforesaid the parties of the second part undertook and promised to pay said city a yearly rental of $1,500; to cancel certain claims of said parties against said city, amounting to about $8,000; to lay down in the streets of said city 12 miles of iron pipes, of sufficient capacity to supply the inhabitants of said city with water for domestic purposes, and extend said pipes as fast as the citizens desiring water for domestic purposes would agree to take sufficient water to pay 10 per cent. per annum upon the cost of such extensions, and erect one hydrant, as protection against fire, at one corner of each crossing of streets where pipes were, or might thereafter be, laid; to erect an ornamental fountain on the public plaza, at a cost not to exceed $1,000; to construct and erect within two years such reservoirs, machinery, ditches, and flumes as would secure to the inhabitants of said city a constant supply of water for domestic purposes; to furnish water free of charge for the public school houses, hospitals, and jails; to keep in repair all of said improvements at the cost and expense of the parties of the second part for said term of thirty years; and to return said water works to said party of the first part, at the expiration of said term, in good order and condition, reasonable wear and damage of the elements excepted, upon payment to said parties of the value of the aforesaid improvements, to be ascertained as provided for in the contract; to give a bond in the sum of $20,000 for the performance of said contract; and to pay all state and county taxes assessed upon said water works during said period of 30 years.    Griffin, Beaudry, and Lazard applied for and procured said contract on behalf and for the benefit of themselves and other persons, with the intention of forming a corporation to carry out said contract, and afterwards, about the middle or latter part of August, 1868, themselves and said other persons being the incorporators, organized, under the laws of the state of California, the Los Angeles City Water Company, for the purpose of supplying the inhabitants of said city with water for domestic purposes, etc., under the terms of said contract, and assigned all their rights and franchises under said contract to said company, by a written instrument dated June 12, 1869, and recorded in the office of the recorder of said county of Los Angeles June 15, 1869.    On April 2, 1870, the legislature of California passed an act, hereinafter set forth, in terms ratifying and confirming said contract.

Griffin, Beaudry, and Lazard did nothing personally in carrying out said contract, or constructing or maintaining said water works; but said company, after it was organized, took possession of said water works, and has performed all of the above-mentioned obligations of said contract, except the one providing for the return of the water works at expiration of lease, and in such performance has laid 320 miles of pipe, erected over 500 hydrants for protection against fire, and constructed 6 reservoirs, with an aggregate capacity of nearly 66,000,000 of gallons, and is now, as it has been at all times since the contract was made, furnishing the city of Los Angeles with water for the extinguishment of fires, and for

the public schools, hospitals, and jails in said city, free of charge. The aforesaid extensions of the water works were rendered necessary by the growth of said city, whose population in 1868 was between 5,000 and 6,000, and is now about 103,000. During the whole of the year 1868 the territorial limits of the city of Los Angeles were as follows: Four square leagues, in a square form, the center of which was the center of the old pueblo plaza. About 1872 the limits were extended 420 yards south of the former south boundary; and within the past three years, and prior to July, 1897, the limits were further extended so as to take in between 10 and 15 square miles of additional adjoining territory. Immediately after the extension of the said limits the Los Angeles City Water Company began to extend its pipes over the said addition to the city as the same was settled up and improved, and ever since has been, and is now, furnishing water to the people in said district added to the original territory of the city, and, upon the demands of the city council, erected fire hydrants within the said additional territory, and furnished water free of charge, and has in all respects continued to lay pipes, erect fire hydrants, and furnish the inhabitants with water for domestic uses, in like manner as it has conducted the same business within the original limits of the city as established by the act incorporating it. And so with the more recent extensions of the city limits, to wit, those made within the last three years, the company has also extended its pipes in portions of those limits, and furnished water in the same way. The quantity of water required to supply the domestic wants of the people of said city is 1 inch of water, measured under a 4-inch pressure, to every 100 inhabitants. To meet the increased demands upon it for water under said contract, said company has, among other things, purchased the system known as the "Beaudry System of Water Works," and also certain water rights in the Arroyo Seco, and conducted water from the Arroyo Seco into the city on the east side of the Los Angeles river, and has been furnishing the inhabitants of that portion of the city with water from said system, and also acquired the stock of the corporation known as the East Side Spring-Water Company,—the same mentioned in paragraph 10 of the complaint. In the growth of the city, its settlement extended to localities of higher elevation than those occupied by its inhabitants at the time of said contract, and the point originally selected for the diversion of the water of the Los Angeles river for supplying the city and its inhabitants, as in said contract provided, was so located in said river that it was impracticable to there maintain dams and diversion works that would not occasionally be swept away or rendered useless by floods; and the surface water of the river after severe storms became muddy, and unfit for supplying the inhabitants with water for domestic uses; and in the year 1889 the Crystal Springs Land & Water Company made excavations in the places referred to in the bill of complaint, and laid the pipes therein as alleged; and the water that has been used by the Los Angeles City Water Company for supplying the city with water as provided in

said contract has ever since been obtained from that source, except that from time to time a further supply of water has been taken from the Los Angeles river in order to supply said inhabitants, which diversions have been at or near the place where the said underground pipes are laid; and that by these means the water can be delivered to the higher elevations, and the underground waters, as to quality and amount, are thus protected against the influences of floods.

The Los Angeles City Water Company, ever since its incorporation, has taken more than 10 inches of water, measured under a 4-inch pressure, from the Los Angeles river; and the amount taken has increased with the increase of the population of the city, and the demands of the municipality itself for water for extinguishing fires, and the other public purposes referred to in the said contract, and the amount has increased until now it requires from 1,000 to 1,500 inches of water, measured under a 4-inch pressure, for such purposes; and during the summer season the amount of water used by the Los Angeles City Water Company for the purposes aforesaid runs from 1,000 to 1,500 inches, under a 4-inch pressure, inclusive of the water obtained by the underground excavations, which latter furnish from 650 to 690 inches, measured under a 4-inch pressure. The city of Los Angeles has always had flowing in the Los Angeles river, at the point from which said Los Angeles City Water Company has always diverted water from said river, a quantity of water sufficient to have supplied said Los Angeles City Water Company with all the water required to supply said city and its inhabitants with water for domestic purposes and municipal uses, and has never objected, up to October 20, 1896, to said Los Angeles City Water Company taking as much water from said river as it might require for said uses; and during all of said period said city has never objected to said company's taking from the surface stream of said river at said point as much water as said company needed for said uses. On October 19, 1896, the council of the city of Los Angeles adopted a resolution requiring the Los Angeles City Water Company to pay to the city of Los Angeles an amount of money equal to 40 per cent. of the gross rates received by said company from the consumers of water as rental for all water taken by said company from the Los Angeles river, and before the 21st day of October, 1896, to attorn to the city of Los Angeles, as tenant of said city, for all of the water so taken from said river, and to agree to pay said rental to said city, and, in case of failure to attorn and agree to pay said rental, to refrain from diverting, taking, or interfering with any of the water mentioned in said resolution, except 10 inches, after the 20th day of October, 1896. On October 19, 1896, the city attorney, in writing, notified the Los Angeles City Water Company and the Crystal Springs Land & Water Company of said resolution, and demanded compliance therewith, delivering a copy of said resolution to each of said companies. Neither of them ever attorned to said city for said water or any part thereof, or ever agreed to pay any rental for the

same. After the passage of said resolution, and ever since said notification, up to the present time, the Los Angeles City Water Company has continually taken from the Los Angeles river, at a point above the northern boundary of said city, for the purposes of distribution and selling the same in said city, a quantity of water varying from 400 to 1,000 inches, measured under a 4-inch pressure. On the 19th day of April, 1870, the common council of the city of Los Angeles accepted, and the mayor approved, the following report:

"To the Honorable the Mayor and Common Council of the City of Los Angeles, and the Los Angeles City Water Company: The undersigned, commissioners duly appointed on behalf of your honorable bodies to adjust, fix, and establish the rates and charges of the Los Angeles City Water Company (a corporation duly incorporated under the laws of the state of California for the purpose of supplying the inhabitants of Los Angeles city with pure, fresh water, respectfully report that they have established water rates and charges for domestic purposes, taking as a guide, as near as can be, the charges and rates for domestic purposes charged in July, 1868; that your committee have also fixed the rates and charges for other reasonable objects and purposes, and report as follows, to wit." (Then follow the rates agreed upon.)

The commissioners referred to in said report had been previously selected, two by the city, and two by the Los Angeles City Water Company. In June, 1871, the city council, on a report of a committee constituted similarly to the one above mentioned, established the same rates as those established in April, 1870. On the 13th of August, 1874, a committee, constituted in the same manner and for the same purposes as the committee already mentioned, reported that they had established water rates and charges for domestic purposes, taking as a guide, as near as possible, the charges and rates for domestic and other reasonable objects and purposes charged in July, 1868. The report was adopted, and a committee appointed, in conjunction with the city attorney, to draft an ordinance embodying the rates fixed in said report; and thereafter, on August 20, 1874, an ordinance so drawn was adopted by the council of said city, and the rates established by said ordinance were the same as those established in 1870 and 1871. Since and including the year 1880 the city council of the city of Los Angeles has in February of each year passed an ordinance fixing the rates to be charged by all corporations and persons within said city supplying water to the inhabitants thereof, to be in force from one year from and including July 1st, which rates have been less than the rates charged in 1870, as contained in the ordinance hereinbefore mentioned, and the Los Angeles City Water Company has collected the rates thus fixed by the city of Los Angeles, and no more; but in the year 1896 the council of the city of Los Angeles passed an ordinance fixing the rates to be charged for water for the year commencing July 1, 1896, and ending June 30, 1897 at less than they had ever been fixed before, and a suit was then brought by the complainants herein, in this court, against the city of Los Angeles, to set aside the said ordinance; and in February of the year 1897 the city of Los Angeles passed the ordinance which is assailed in this suit, making a still further reduction in the rates. The action of the Los Angeles City Water Company in collecting the rates fixed by said

several ordinances constitutes the only acquiescence (if it be an acquiescence) in the action of said council.    If the rates established in 1870 were collected for the year beginning July 1, 1897, and ending June 30, 1898, the revenues received by the Los Angeles City Water Company from said rates would be more than $50,000 in excess of the amount which would be received under the rates named in the ordinance of February, 1897.    In January, 1882, the Los Angeles City Water Company furnished to the council of the city of Los Angeles a statement of its transactions for the preceding year; protesting at the same time against the establishment of any rates less than those which were in force at the date of the lease hereinbefore mentioned, to wit, July 22, 1868.    In January, 1883, said company again furnished said council with a statement showing the names of the consumers of water, the rates paid during the year preceding the date of the statement, and also an itemized statement of the expenditures made for supplying water during the year preceding, but expressly denying any legal right on the part of the council to demand said statement, or to fix any rates less than those which were in force in July, 1868.    Similar statements, accompanied by similar protests, were made annually thereafter, up to and including the year 1889; and since that time unverified statements or reports, showing its receipts and expenditures, have been made by said company to the city council each year.    Article 14 of the present constitution of California, adopted in 1879, is as follows:

"Article XIV.    Water and Water Rights.

"Section 1. The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law: provided, that the rates or compensation to be collected by any person, company, or corporation in this state for the use of water supplied to any city and county, or city or town, or the inhabitants thereof, shall be fixed, annually, by the board of supervisors, or city and county, or city or town council, or other governing body of such city and county, or city or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year and no longer.    Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter.    Any board or body failing to pass the necessary ordinances or resolutions fixing water rates, where necessary, within such time, shall be subject to peremptory process to compel action at the suit of any party interested, and shall be liable to such further processes and penalties as the legislature may prescribe.    Any person, company, or corporation collecting water-rates in any city and county, or city or town in this state, otherwise than as so established, shall forfeit the franchises and water-works of such person, company, or corporation to the city and county, or city or town where the same are collected, for the public use.

"Sec. 2. The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

To carry out these provisions of the constitution, the legislature of California passed an act entitled "An act to enable the board of supervisors, town council, board of aldermen," etc., which was approved March 7, 1881 (St. Cal. 1881, p. 54).    In the year 1888, the electors of the city of Los Angeles, pursuant to provisions of the

constitution of said state authorizing them so to do, adopted a charter for said city, which charter was, under the provisions of said constitution, submitted to the legislature of said state for its approval, ratification, and adoption; and the said charter was on the 31st day of January, 1889, adopted by said legislature, and thereupon became, and ever since has been, the charter of the said city of Los Angeles; and by the said charter it is provided, in section 193, as follows:

"The rates of compensation for use of water to be collected by any person, company or corporation in said city shall be fixed annually by ordinance and shall continue in force for one year, and no longer. Such ordinance shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Should the council fail to pass the necessary ordinance fixing the water rates within the time hereinbefore prescribed, it shall be subject to peremptory processes to compel action at the suit of any party interested." St. 1889, p. 503.

The ordinance of 1897, now sought to be annulled, was passed pursuant to the foregoing constitutional and statutory provisions.

The facts showing the connection of S. G. Murphy and the Crystal Springs Land & Water Company with the litigation need not be enumerated, since the defendants waive all questions as to the joinder of these parties, and said facts are not material to any point determined in this opinion: The agreed statement of facts contains certain stipulations in regard to the issues submitted which are likewise immaterial here, but which will be carried into the final decree.

Complainants' contention, succinctly stated, is that said ordinance of February, 1897, impairs the obligation of the contract of July 22, 1868, between the city of Los Angeles and the assignors of the Los Angeles City Water Company,—Griffin, Beaudry, and Lazard,—in that the rates fixed by said ordinance are less than the rates charged at the date of said contract, and therefore said ordinance is repugnant to the constitution of the United States, and ought to be annulled. This contention clearly involves a question of federal cognizance.

The defenses to the suit are as follows: First, that said contract, in so far as it purports to limit the right of the city to regulate water rates, was, on the part of the city, unauthorized, and is void; second, that the evidence fails to show that the rates fixed by said ordinance of 1897 are less than the rates that were charged by the assignors of said water company at the date of said contract; third, that said water company since October, 20, 1896, has continuously violated a material provision of said contract, by taking from the Los Angeles river more than 10 inches of water, measured under a 4-inch pressure; fourth, that there has been such acquiescence by the water company in the right of the city to regulate water rates unrestrained by said contract as now precludes complainants from obtaining the relief sought; fifth, that the injuries resulting from said ordinance are not irreparable, and complainants have adequate legal remedies. These defenses will be considered separately, and in the order of their statement.

1. A question has been raised by the defendants as to the proper construction of that clause of the contract above mentioned limiting the right of the city to regulate water rates, and it will be best to

determine that question before passing upon the validity of said clause.    The contention of defendants is that said clause refers exclusively to a right of regulation given the city by the contract itself, and was not intended as a limitation upon any power which had been, or might thereafter be, conferred by the legislature of the state. This contention is not well taken.    The contract does not grant, nor purport to grant, to the city any right in respect to the regulation of rates; the language being that "the mayor and common council of said city shall have, and do reserve, the right to regulate water rates," etc.    The use of the word "reserve" shows that the parties were contracting, not with reference to a right which it was supposed the lessees were granting to the city, but with reference to a right or power which they assumed the city already possessed.    The parties manifestly intended by the clause now under consideration that the lessees should have a right to the minimum rates prescribed, namely, the rates that were then charged; and, if the city was authorized to make such an agreement, neither it nor the legislature of the state could thereafter lawfully reduce the rates below the minimum so agreed upon.    Whether or not these minimum rates are collectible by actions at law before they have been established by the city need not be determined here.    I now come to the question of authority.

The city of Los Angeles was incorporated by an act of the legislature of California passed April 4, 1850, which simply described the boundaries of the city, and declared it to be incorporated according to the provisions of the act entitled "An act to provide for the incorporation of cities," passed March 11, 1850, fixed the number of councilmen at seven, and made said city successor to all the rights, claims, and powers of the pueblo of Los Angeles in regard to property.    Section 2 of the aforesaid act of March 11, 1850, is as follows:

"Sec. 2. When any city is incorporated by a special act of the legislature, such act may simply define the boundaries of the city, and declare it incorporated, in which case it shall be deemed incorporated according to the provisions of this act; or may declare it incorporated under the same, with such changes as may be specially named."

Section 7 of said act gives to any city incorporated thereunder power to grant franchises, hold and receive property, real and personal, within said city; to lease, sell, and dispose of the same for the benefit of said city. St. Cal. 1850, p. 86.    Section 11 of the same act provides that the city council "shall have the power    *    *    *    to establish a fire department, and to make regulations to prevent and extinguish fires;    *    *    *    to provide for supplying the city with water."    Did these acts of the legislature empower the city of Los Angeles to make the agreement in question?    "It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others:    First, those granted in express words; second, those necessarily or fairly implied in, or incident to, the powers expressly granted; third, those essential to the declared objects and purposes of the corporation,—not simply convenient, but indispensable.    Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied.    *    *    *"    1 Dill. Mun. Corp. p. 115,

§ 89. This text is cited with approval by defendants in their brief, and, without referring to the numerous cases also cited in the same connection, may be accepted as a clear summary of the law on the subject to which it relates. The power of the city of Los Angeles to agree upon water rates, I think, is fairly implied in the power "to provide for supplying the city with water," and therefore falls within the second class of powers enumerated by Judge Dillon. Two cases, and only two cases, directly in point, have been called to my attention: Santa Ana Water Co. v. Town of San Buenaventura, 56 Fed. 339, and Illinois Trust & Savings Bank v. City of Arkansas City, 22 C. C. A. 171, 76 Fed. 271. Both of these cases sustain the conclusion which I have just announced; and, in the former case, where the facts were strikingly analogous to those in the case at bar, Judge Ross held valid an agreement whereby the town of San Buenaventura granted to the assignors of the Santa Ana Water Company "the unrestrained right to establish such rates for the supplying of water to private persons as they may deem expedient, provided that such rates be general." From the opinion of Judge Ross I quote as follows:

"The doctrine is firmly established that the state may, by a contract, restrict the exercise of some of its most important powers;" citing New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Manufacturing Co., 115 U. S. 650, 6 Sup. Ct. 252, and Water-Works Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. 273. "* * * The principle controlling the decisions cited is a just and plain one. The duty is imposed upon the legislative power that creates a municipal corporation to provide for the necessary elements of gas and water. It may, at its discretion, do so directly; or it may, in the absence of any constitutional inhibition, say, directly, or through the municipal corporation so created, to its individual citizens, in the language of the supreme court (In re Binghampton Bridge, 3 Wall. 74): 'If you will embark with your time, money, and skill in an enterprise which will accommodate the public necessities, we will grant to you, for a limited period, or in perpetuity, privileges that will justify the expenditure of your money, and the employment of your time and skill.' 'Such a grant,' said the court in the case from which the quotation is taken, 'is a contract with mutual considerations, and justice and good policy alike require that the protection of the law should be assured to it.'"

Defendants cite a large number of cases to the effect that a general power conferred upon a municipal corporation to supply the city with water does not include authority to grant an exclusive franchise therefor to others. This proposition, however, is not now before the court, since the defendants admit that the fact of an exclusive franchise having been granted to the complainants' assignors, if such was the case, does not vitiate the contract in other respects. To my mind there is a clear and broad distinction, so far as concerns the power of a municipal corporation to make them, between the grant of an exclusive franchise to supply the city with water, and an agreement which abridges the right of such corporation to regulate the price of the water so supplied. The grant of an exclusive franchise is not an indispensable, or even appropriate, means to the procurement of water, and, besides, creates a monopoly (and it is upon these grounds that many of the decisions holding such grants inoperative are rested); while an agreement fixing the price to be paid for water does not destroy, nor is it inimical to, competition, and is both appropriate and indispensable to a reasonable and convenient exercise of the

general power to supply water.    In procuring water, or any other commodity, by purchase, one of the first things to be considered and agreed upon is the matter of price.    Therefore, to hold that general power, without limitation, in a municipal corporation, to supply the city with water, does not include power to agree upon price, it seems to me, would be a solecism.    In State v. Laclede Gaslight Co., 102 Mo. 485, 14 S. W. 974, and 15 S. W. 383, the court says:

"It is not open to doubt or dispute that this power to make and vend gas carries with it, as an invariable incident, the right to fix the price of the gas thus made and sold.    No other conclusion can be drawn from the premises.    A sale implies a price.    It would be but the granting of a barren right indeed which would confer power to incur expense and perform labor, and yet deny the power to fix and to reap the fruits of that labor, to wit, the price. Whatsoever the law necessarily implies in a statute or in a contract is as much part and parcel thereof as if expressly stated therein.    So that by the terms of the charter of the respondent company its right to fix the price of its product was as much a part of its charter as if it had been, in terms, set forth in section 5 of the original act of incorporation."

The words of the grant in the case at bar, "power    *    *    *    to provide for supplying the city with water," are clear and unambiguous, and, in my opinion, admit of no other reasonable construction than that they were intended to confer upon the city of Los Angeles, so far as concerns the means necessary to supply the city with water, powers as ample as the legislature itself possessed.    This delegation of power to the city was not, of course, a relinquishment by the legislature of its control over the subject.    The legislature could at any time revoke the power delegated to the city, and provide directly, through agencies of its own selection, for supplying the city with water, provided such revocation or provision should not impair any previously vested rights.    In Illinois Trust & Savings Bank v. City of Arkansas City, supra, the words of the grant were:

"Full power and authority to contract for and procure water works to be constructed for the purpose of supplying the inhabitants of such cities with water."

While this phraseology is more diffuse, the grant it makes is neither clearer nor broader than the grant in the case at bar; and with reference to the former the court of appeals for the Eighth circuit said:

"The powers granted to this city by the legislature of the state of Kansas to contract for and procure water works are plenary and unlimited, save by the duty to exercise them with reasonable discretion, and it is not the province of the court to contract or clip the legislative grant."

Grants of this power have been upheld in some well-considered cases, on the ground that the power is a business or proprietary power, as distinguished from a governmental or legislative power. Illinois Trust & Savings Bank v. City of Arkansas City, supra; City of Cincinnati v. Cameron, 33 Ohio St. 336, 367; Safety Insulated Wire & Cable Co. v. City of Baltimore, 13 C. C. A. 375, 66 Fed. 140; State v. Mayor, etc., of City of Great Falls (Mont.) 49 Pac. 15, 21; 1 Dill. Mun. Corp. § 27.    In the first of these cases the court says:

"In contracting for water works to supply itself and its inhabitants with water, the city is not exercising its governmental or legislative powers, but its business or proprietary powers. The purpose of such a contract is not to govern its inhabitants, but to obtain a private benefit for the city itself and its denizens. 1 Dill. Mun. Corp. § 27; City of Cincinnati v. Cameron, 33 Ohio St. 336, 367; Safety Insulated Wire & Cable Co. v. City of Baltimore, supra, and cases cited under it."

In City of Cincinnati v. Cameron the court says:

"The power given to a city to construct sewers is not a power given for governmental purposes, nor is it a public municipal duty imposed upon the city, like that of keeping streets in repair, but it is a special legislative grant to the city for private purposes. The sewers of the city, like its works for supplying the city with water, are the private property of the city. The corporation and its corporators, its citizens, are alone interested in them. The outside public, as people of the state at large, have no interest in them, as they have in the streets of the city, which are public highways. City of Detroit v. Corey, 9 Mich. 165."

If, however, it be conceded, contrary to these authorities, and as claimed by defendants, that the power of a city to regulate water rates is legislative or governmental, the city may, by contract, abridge such power, under an implied as well as an express legislative grant; and this rule is recognized by many of the authorities upon which defendants rely. Thus, in one of them it is said:

"Powers are conferred upon municipal corporations for public purposes; and as their legislative powers cannot, as we have just seen, be delegated, so they cannot, without legislative authority, express or implied, be bargained or bartered away. Such corporations may make authorized contracts, but they have no power, as a party, to make contracts or pass by-laws which shall cede away, control, or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties. * * *" 1 Dill. Mun. Corp. (4th Ed.) § 97.

It is worthy of note that the words, "without legislative authority, express or implied," are not found in the first three editions of Judge Dillon's work. I take it, therefore, that a review of the subject made by him subsequent to said editions satisfied him that the governmental as well as business powers of a city could be abridged by contract, if there were legislative authority therefor, and, that such authority could arise by implication as well as by express grant. See, also, State v. Cincinnati Gaslight & Coke Co., 18 Ohio St. 292; Santa Ana Water Co. v. Town of San Buenaventura, supra; Illinois Trust & Savings Bank v. City of Arkansas City, supra. As already stated, most if not all of the cases cited by defendants on this point, some of which are specially referred to below, relate to exclusive franchises; and in many of these cases the franchises are denied, not because they involve the exercise of governmental functions, but upon the grounds that they are monopolies, and unnecessary to the accomplishment of the general objects of the grants; and herein lies the wide distinction between such cases and the case at bar. In Jackson County Horse R. Co. v. Interstate Rapid Transit Ry. Co., 24 Fed. 308, 309, it is said:

"Again, exclusiveness of occupation is not necessary to the full performance of a street-railroad company of all its functions. The running of a street rail-

road on one street is in no manner interfered with by the running of a similar road on a parallel street. Doubtless the profits of the one will be increased if the other is stopped. Monopoly implies increase of profits. But the question of profits is very different from that of the unimpeded facilities for transacting business. The latter may be granted without any exclusiveness. And power to grant all facilities for transacting business does not imply power to forbid all others from transacting like business. Even where a charter is granted by the legislature directly, it grants no exclusive right, unless the exclusiveness is expressly named. As said by Judge Dillon (2 Mun. Corp. § 727): 'But a legislative grant of authority to construct a street railway is not exclusive, unless so declared in terms; and therefore the legislature may at will, and without compensation to the first company, authorize a second railway on the same streets or line, unless it has disabled itself by making the first grant irrepealable and exclusive.' And, if a direct grant from a legislature carries no implication of exclusiveness, why should it be presumed that the legislature intended to vest in a city the power to give exclusive privileges, when it has in terms granted no such power? Will the power to create monopolies be presumed, unless it is expressly withheld? That would reverse the settled rule of construction, which is that nothing in the way of exclusiveness or monopoly passes, unless expressly named."

Again, in another case relied on by defendants, the grant of an exclusive right of selling to the city of Helena all water required by it, etc., for the period of 20 years, was held to be void on the ground, among others, that it was a monopoly; the court saying:

"Then, the power to provide the city with water, by making a proper contract with some person to erect water works and sell water to the city, being conceded, the next question that presents itself is as to the power of the city to make this particular contract. Is the present such a contract as to be beyond the power of the city council to enter into so as to bind the municipal corporation? Does this contract create a monopoly? For, if it does, it goes beyond the power of a city council. Monopolies may be created, but they must be called into being by the sovereign power alone. A city council has no authority to grant to any person a monopoly, even where no express prohibition is found in the charter, or other acts of the legislature. Monopolies are contrary to the genius of a free government, and ought not to be encouraged by the people, or countenanced by the courts, except when expressly authorized by positive law."

Not only does the court rest its decision upon the ground that the franchise was a monopoly, but it expressly recognizes the power of the city to abridge by contract, in some degree, its governmental functions, as follows:

"But it is insisted by the council for respondents that the making of this contract or the passing of this ordinance is ultra vires, because it ties up and embarrasses the functions of future councils. Every ordinance in the nature of a contract would do this to some extent, and, unless the contract entered into by means of this ordinance should bind the city corporation for an unreasonable time, this objection would not be fatal."

The grant of power to the city in that case was as follows:

"The city council shall have power to provide the city with water, erect hydrants and pumps, build cisterns and dig wells in the streets, for the supplying of engines and buckets, * * * to provide for the prevention and extinction of fires." Davenport v. Kleinschmidt (Mont.) 13 Pac. 254.

The court then holds that, under the peculiar terms of the contract in question, 20 years was an unreasonable time for it to continue. This feature of the case, however, I will consider in a subsequent and more appropriate connection.

In Illinois Trust & Savings Bank v. City of Arkansas City, 22 C. C. A. 179, 76 Fed. 279, the court says:

"This city, then, had the power to grant to the gas company the privilege of using its streets for water pipes, and it had power to rent hydrants of that company, when this contract was made. For the purposes of this discussion, we shall concede that it had no power to make the privilege of the gas company to use its streets exclusive, because such a grant tends to create a monopoly. The general rule is that the legislature alone has the power to make exclusive grants of this character, and that this authority does not vest in the municipality, unless it is expressly granted to it by its charter."

In Omaha Horse Ry. Co. v. Cable Tramway Co., 30 Fed. 328, the monopoly feature of the grant there under discussion was referred to thus:

"This rule of construction against the grantee, which applies in all legislative grants, obtains with the greater force in a case like the one at bar, where the grant claimed is not merely the right to do something, but of a right to exclude all the rest of the public from doing that thing. He who says that the state has given him a franchise, a right to do that which without that franchise he could not do, will be compelled to show that the franchise, the right claimed, is within the terms of his grant. Much more strenuous must be the demand upon him for clear and explicit language in his grant when he claims that a part of it is not merely the franchise, the right to do, but also the right to exclude all others of the public from exercising the same right, and the state, as the representative of the public, from according the same right to another."

In Saginaw Gaslight Co. v. City of Saginaw, 28 Fed. 529, in considering the question whether the common council of that city had power to confer an exclusive franchise upon the plaintiff to light its streets with gas for 30 years, the court said:

"That the state, in its sovereign capacity, may grant a monopoly of this description, and that such monopolies will be protected against a subsequent conflicting grant, has lately been settled by the supreme court in New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Manufacturing Co., 115 U. S. 650, 6 Sup. Ct. 252, and Louisville Gas Co. v. Citizens' Gaslight Co., 115 U. S. 683, 6 Sup. Ct. 265. But whether, under a charter simply authorizing a municipal corporation 'to cause its streets to be lighted,' it may grant an exclusive privilege of this description for a term of years, is a widely-different question. Bearing in mind that the powers of the municipality are strictly limited by its charter, it is needful to inquire whether the grant of an exclusive franchise is a proper and reasonable method of exercising its authority to furnish gas to its inhabitants. We think it entirely clear that the city is not bound to manufacture and furnish the gas itself, but may contract with any individual or company for the city, and, as an incident thereto, may authorize the use of its streets for laying pipes and mains. * * * It is clear, however, that there is no authority expressly given to confer upon any corporation an exclusive right to occupy its streets for a number of years. * * * The common law of England declares that monopolies cannot emanate from the crown, and can only be conferred by act of parliament (Bac. Abr. tit. 'Monopoly'), and a by-law which creates a monopoly is void (Jac. Law Dict.). The great weight of authority in this country is in the same direction," etc.

In State v. Cincinnati Gaslight & Coke Co., 18 Ohio St. 293, the court says:

"Now, we concede that the streets of a city may be appropriated to authorized purposes, promotive of the convenience and welfare of its inhabitants, and not substantially interfering with the public easement or right of travel. And from partial appropriations of this character rights of private property may arise which cannot rightfully be disturbed. But, when it is sought

to couple with such partial appropriation a stipulation that no further use of unoccupied portions of the streets shall be thereafter permitted or made for similar purposes, this is not the exercise of the power of appropriation, but an attempt to prohibit its exercise; and, when the effect is to create a private monopoly, the power of the city council thus to devest itself of authority conferred upon it, as a public agent, for the benefit of others, must be clearly shown."

In that case, however, the court holds that even the power to grant an exclusive franchise may arise by implication as well as from express terms; the language of the court being as follows:

"And, assuming that such a power may be exercised directly, we are not disposed to doubt that it may also be exercised indirectly, through an agency of a municipal corporation, clearly invested, for police purposes, with the necessary authority. But we have referred to these authorities as our justification for saying that when a franchise so far in restraint of trade, and so pregnant with public mischief and private hardship, is drawn in question, and is claimed to be derived through a municipal ordinance or contract, the power of the municipal authorities to pass the ordinance or enter into the contract must be free from doubt. It must be found on the statute book, in express terms, or arise from the terms of the statute by implication so direct and necessary as to render it equally clear."

This review of defendants' citations shows that in each case the franchise claimed was denied, not because it was legislative or governmental in its nature, but because it was a monopoly, and in the first case for the additional reason that the franchise was not necessary to the accomplishment of the general objects of the grant. Neither of these reasons applies to the case at bar. The abridgment of the right of the city to regulate water rates does not create a monopoly, and is a necessary means to the proper exercise of the general power to supply the city with water.

Defendants further insist that the rates fixed by the ordinance of 1897 are not unreasonable, or, in other words, that they allow to complainants a fair income on their investment. The question, however, as to the reasonableness or unreasonableness of the rates fixed by the ordinance is not here involved. The only question, so far as concerns the matter of reasonableness, is whether or not the contract of July 22, 1868, was reasonable; and in determining this question the contract should be construed, not in the light of developments that have since been made, but with reference to the conditions which surrounded the parties at the date of the contract. The fact that said contract, because of the rapid growth of the city of Los Angeles, has proved largely remunerative to the complainants, does not make the contract unconscionable. On this point the following extract from the case of Illinois Trust & Savings Bank v. City of Arkansas City, 22 C. C. A. 182, 76 Fed. 283, may be aptly quoted:

"It cannot but be clear to all who are familiar with the condition of cities of the second class—cities whose population was between 2,000 and 15,000—in the state of Kansas in 1872, when this grant was made, that it was not the intention of the legislature of that state to limit the terms of these contracts to the single year during which the terms of office of the members of the city councils continued. The cities were young and poor, but they were ambitious and sanguine. They did not have the ready money to construct the water works which the health and comfort or their inhabitants required. It is hardly possible that any individual or corporation could have

been induced to expend the thousands of dollars required to construct such works as have been built in this city in consideration of the right to use the streets of the city for that purpose, and of the promise of rental for its hydrants for the limited term of a single year. These facts the members of the legislature must have known, and they undoubtedly granted this plenary power to contract for the very purpose of enabling the cities to procure a supply of water for their inhabitants by grants of privileges to private parties to use their streets for that purpose for a reasonable term of years, and by covenants to pay rentals for hydrants for a like term. In any event, the legislature made this grant; and it thereby vested in the mayor and council of the city the right to make such contracts for such terms as, in their discretion, they thought proper."

In another case it has been held that:

"Where a city with a population of 5,000, and an assessed valuation of property of two and a quarter millions of dollars, contracts with a person giving him the exclusive privilege of laying water mains in the city for 30 years, and providing that he shall furnish the city with 50 fire hydrants, for each of which it shall pay him a rent of $80 per year for the 30 years, with a stipulation that at the end of 10 years it may, at its option, buy the water works, at a price commensurate with the productive value thereof, the contract will not, after the city has enjoyed the benefit of it for over 10 years, be held so unreasonably oppressive or contrary to public policy as to be void." Fergus Falls Water Co. v. City of Fergus Falls, 65 Fed. 586:

It is noticeable that in the case last cited the city of Fergus Falls was paying $80 per year for each hydrant, while in the case at bar the city of Los Angeles gets the use of the hydrants, now 500 in number, free of charge.

In Davenport v. Kleinschmidt, supra, where the court held that 20 years was an unreasonable period for the continuance of the contract, the reasons for the ruling are thus stated:

"Is 20 years a reasonable time? The city charter provides for the election of the mayor and half the aldermen in April of each year. City Charter, art. 4, § 1. The complaint alleges the taxable property of the city of Helena to be not more than $5,000,000; that the bonded indebtedness of the city amounts to $19,500; that the floating debt, in outstanding warrants, amounts to $15,000. Four per cent. of the taxable property of the city would amount to $200,000. The charter permits the levy of taxes to the extent of three mills on the dollar for general purposes, and the same for fire department purposes. City Charter, Amend. 1885, p. 25. On the present valuation, these levies might amount to $15,000 each, if the taxing power was exerted to the limit. The city of Helena was chartered in 1881. Twenty years ago it was a mining camp on the banks of Last Chance gulch, containing a few hundred people. The last official census of the city, taken in 1880, shows a population of not more than 4,000. Reliable data place the present population at about 10,000. The ordinance provides that Woolston shall receive for the water running through each of the first 150 hydrants provided for, $20 per year out of the general fund, and $80 per year out of the fire department fund; being $100 for each hydrant altogether, and amounting in the aggregate, for the 150 hydrants, to $15,000 per annum. Then, as the mains are extended, additional hydrants are required to be erected, and for these Woolston is to receive $13 per year out of the general fund, and $52 per year out of the fire department fund; making in the aggregate $65 per year for each additional hydrant. If ten miles more of pipe should be laid, at least 100 additional hydrants must be paid for, at an annual cost of $6,500. If the whole cost of the 150 hydrants were to be paid out of the fire department fund, it would take every dollar which could be placed into that fund, at the present valuation. This ordinance is designed to be irrepealable and unchangeable for the period of 20 years. We have a right to consider all these things in determining whether or not 20 years is a reasonable time for such a contract

to run. Under all the circumstances indicated, we cannot consider that the city council has the right to bind such a city as Helena by such a contract for so long a period. We are not called upon to indicate what would be a reasonable time for which the city might make such a contract, if at all. It is sufficient for us to say in this case that 20 years is not a reasonable time. It is useless to argue that, if the council have power to bind the city for 20 years, it has the power to bind it for 100 or 1,000 years, or, on the other hand, to say that, if the council cannot bind the city for 20 years, it cannot do so for 1 year or 1 month. Such assertions of extreme cases may answer for illustration, but as arguments they are fallacies, which cannot bear the strong light of reason." Davenport v. Kleinschmidt (Mont.) 13 Pac. 256.

Thus, it will be seen that the 20-year limit in the contract was held unreasonable, mainly, if not wholly, because of the expenditures which the city was annually incurring for hydrants. Here there is no such expenditure. If the city of Los Angeles, however, was paying for its hydrants at the lowest rate above mentioned ($65 per year for each hydrant), the expenditures on this account (there being 500 hydrants) would amount in the aggregate to $32,500 per annum. The case last cited therefore does not support, but is against, defendants' contention; for, according to the theory of that case, the large benefits which the city of Los Angeles has enjoyed under the contract of July 22, 1868, in the way of free water and hydrants for municipal uses, saves the contract, if there were nothing else to do so, from the charge of unreasonableness. See, also, McBean v. City of Fresno, 112 Cal. 159-169, 44 Pac. 358, and State v. Mayor, etc., of City of Great Falls (Mont.) 49 Pac. 15-21.

Defendants further contend that the limitation in said contract as to water rates is void because of the act of May 3, 1852 (St. Cal. 1852, p. 171). Said act, however, is not applicable to the case at bar, for the reason that Griffin, Beaudry, and Lazard at the date of said contract were not incorporated under that or any other act. The following extract from the case of Santa Ana Water Co. v. Town of San Buenaventura, 56 Fed. 348, 349, is directly in point here:

"A statute of the state approved May 3, 1852 (St. 1852, p. 171), providing for the incorporation of water companies, declared, in its third section: 'This act shall not give to any company the right to supply any city with water unless it shall be previously authorized by an ordinance, or unless it be done in conformity with a contract entered into between the city and the company. Any contracts hereafter so made shall be valid and binding in law, but shall not take from the city the right to regulate the rates for water, nor shall any exclusive right be granted, by contract or otherwise, for a term exceeding twenty years.' By this act it was declared, as will be observed, that no contract entered into between a city and a company incorporated under the provisions of the act should 'take from the city the right to regulate rates for water.' That provision had no application to Arnaz and his associates, for the reason that they were not incorporated under that or any other act."

But it is insisted by defendants that, even if the contract in question does not violate said act of 1852, it is inconsistent with the policy of the state, as manifested in said act; citing 1 Dill. Mun. Corp. § 319. Defendants, it seems to me, mistake the scope and purpose of said act of 1852. Said act was, as shown by its title, simply "An act to provide for the incorporation of water companies," and does not purport to abridge the powers of munici-

pal corporations, except in their dealings with the private corpo-
rations created under said act. The powers of municipal corpo-
rations in their dealings with individuals are unaffected by said
act of 1852. Defendants' claim, therefore, that it was the policy
of the state, as shown in said act, to apply its provisions to indi-
viduals, when, by a familiar rule of construction, individuals are
excluded therefrom, is untenable. This is well illustrated by sec-
tion 31, art. 4, of the constitution of California of 1849, and the
judicial interpretation thereof. That section prohibits the grant-
ing of franchises by special legislation to private corporations, yet
the supreme court of the state holds, as hereinafter fully set forth,
that grants of franchises to individuals are not within the pro-
hibition.

It is insisted by defendants that the case at bar is distinguish-
able from that of Santa Ana Water Co. v. Town of San Buenaven-
tura, supra, and comes within the reasoning in City and County
of San Francisco v. Spring Valley Water Works, 48 Cal. 493,—
because Griffin and his associates procured their contract with
the intention of forming a corporation to carry out the same, and
that soon thereafter, pursuant to said intention, the Los Angeles
City Water Company, one of the complainants herein, was organ-
ized by them. Now, I do not think that the power of the city
to enter into the contract, or the validity of the contract, can
be affected by the fact that the assignors of the water company,
at the time they procured the contract, intended to assign it to
a corporation thereafter to be formed. Suppose that, after the
making of the contract, Griffin, Beaudry, and Lazard had changed
their purposes, and concluded to carry out the contract as indi-
viduals, and had actually done so; could it be contended that
the contract, if to-day held by them, would be invalid, because
when they procured it they purposed its assignment to a contem-
plated corporation? No one, I think, would so contend. The case
of City and County of San Francisco v. Spring Valley Water Works,
supra, is widely different from the case at bar. Here the con-
tract was not conditioned upon the individuals to whom the fran-
chise was granted (Griffin and his associates) organizing them-
selves into a corporation, while in City and County of San Fran-
cisco v. Spring Valley Water Works a condition similar to the
one indicated did exist, and was the essential ground of the deci-
sion, as shown by the following extract from the opinion of the
court:

"This brings us to the consideration of the Ensign act, so-called. The first
seven sections confer upon Ensign and his associates certain privileges, and
impose upon them certain duties, in respect to furnishing the city and
county of San Francisco with water for the extinguishment of fires and other
municipal uses. Section 8, already quoted, provides that 'this act shall not
take effect unless the parties named in section one shall, within sixty days
after its passage, duly organize themselves in conformity with the existing
laws regulating corporations now in force in this state.' The grant, there-
fore, was not to take effect until Ensign and his associates had become a
corporation under existing laws. It took effect as a grant, not to Ensign
and his associates as private individuals, but to the corporation when formed.
It was an attempt by the legislature to confer, by special grant, upon a

private corporation about to be formed, certain peculiar privileges, and to subject it to certain duties, not common to other corporations formed under the same general law. For the reasons already stated, this was not within the constitutional power of the legislature. When Ensign and his associates became a corporation under the general law, they took only such rights as were derived from that law, and were subject only to such duties as it imposed. The legislature, by special act, could not increase or diminish either." 48 Cal. 514.

Nor does the present case come within the implied suggestion of the court in Water Co. v. Estrada, 117 Cal. 168, 48 Pac. 1075, that the intention of individuals to organize a corporation to carry out the object of a franchise granted to them, other circumstances concurring, might invalidate the grant, for the reason that it does not appear in the case at bar that the city council acted with reference to such intention, or had any knowledge of its existence, or that the contract was made for the purpose of evading the constitution. There is no intimation by the court in the case of Water Co. v. Estrada that a mere intention on the part of the grantees, undisclosed to the granting party, could invalidate the grant. What the opinion in that case does suggest (and even that was outside the facts) is that if the individuals to whom a franchise is granted intend, at the time of the grant, to form a corporation to carry out their contract with the city, and this intention is known to and acted upon by the city, and the contract is made for the purpose of evading the constitution, then it is invalid. None of these circumstances, however, except the intention of the individuals, are shown to have existed here, while there are strong reasons for presuming that there could not have been any intention to evade the constitutional inhibition against grants of franchises to private corporations by special legislation. City and County of San Francisco v. Spring Valley Water Works, 48 Cal. 515, the first case to hold that the provision of the constitution which inhibited the creation of private corporations by special legislation included the grant of a particular franchise to a corporation already existing, was not decided until July, 1874, more than six years after the date of the contract, and more than four years after the ratifying act. That decision, therefore, could not have in any way affected the parties to said contract. California State Tel. Co. v. Alta Tel. Co., 22 Cal. 398, which, contrary to the ruling in the Spring Valley Water Works Case, held that the grant of a private franchise to an existing corporation was not repugnant to the constitutional inhibition against the creation of private corporations by special legislation, was decided in July, 1863, which was five years prior to said contract; and it is reasonable to presume that the parties to said contract accepted that decision as correct and final, and therefore there was no occasion for any purpose or effort to evade the constitution.

Defendants further contend that since the Los Angeles City Water Company was incorporated subsequent to the act of April 22, 1858 (St. Cal. 1858, p. 218), providing, among other things, that water rates should be fixed by commissioners, of whom two were to be appointed by the water company and two by the city, and,

if they could not agree, a fifth to be selected by the sheriff, and since the constitutional provision hereinbefore quoted, prescribing a different mode of establishing water rates from that contained in the act of 1858, was in effect an amendment of said act (Water Works v. Schottler, 110 U. S. 362, 4 Sup. Ct. 48), binding upon corporations previously organized, said company can have no right to collect rates other than those established in the mode pre-scribed by the constitution, and that the fact of said company being the assignee of a contract which gave the grantees and their assigns the right in question cannot alter the case, as the company had no power to acquire such a right; quoting the fol-lowing from People v. Stanford, 77 Cal. 378, 379, 18 Pac. 88, and 19 Pac. 693:

"The defendant the Potrero & Bay View Railroad Company claims the right to maintain a railroad, and to run cars thereon, upon the streets de-scribed in the answer, to collect fares, etc., under and by virtue of the act of April 2, 1866, purporting to grant to certain persons, alleged to be assignors of the Potrero & Bay View Company the right to lay down and maintain an iron railroad along and upon certain streets, and upon acts amendatory thereof and supplemental thereto. The act of 1866 was not a grant of a mere proprietary interest in lands, but was, if valid, a grant of a franchise. The constitution of 1849 provided: 'Corporations may be formed under general laws, but shall not be created by special act,' etc. Article 4, § 31. The true construction of that constitutional provision is that private corpora-tions must derive their powers from general laws, and not from special statutes. City and County of San Francisco v. Spring Valley Water Works, 48 Cal. 513. It follows that, if the grant of the franchise of laying down and maintaining a railroad within the limits of San Francisco to certain persons therein named was a valid and operative grant, yet the defendant corporation acquired no right to the franchise by assignment from such per-sons. To uphold such assignment would be to give to the particular corpora-tion through it a franchise which other corporations of the same class could acquire only by grant from the supervisors, as provided in the general laws. San Francisco v. Spring Valley Water Works, supra."

Defendants' counsel, in their examination of the case last cited, evidently failed to observe the fact that the clause quoted by them, and on which they rely, was from the opinion of a department, and that said clause was expressly overruled, on rehearing, by the court in bank, as follows:

"As to other questions arising upon the answer, they relate to the special answer to the second count of the complaint, which count of the complaint was held in the former opinion to be bad. We adhere to that opinion so far as it relates to these questions, except so far as it holds that a duly-organized corporation cannot take an assignment from its lawful owners of a franchise to lay down and maintain a street railroad. This is based upon the constitu-tional provision that 'corporations may be formed under general laws, but shall not be created by special act.' Const. art. 4, § 31. This provision applies to the formation or creation of corporations, and to the powers directly conferred upon them by legislative enactment, and cannot, in our judgment, be con-strued as prohibiting the assignment of a franchise to a legally created cor-poration by persons having the lawful right to exercise and transfer the same." People v. Stanford, 77 Cal. 371, 18 Pac. 85, and 19 Pac. 698.

The other case cited by defendants in this connection (Water Works v. Schottler, supra) is directly against their contention that the Los Angeles City Water Company could not acquire from indi-viduals a contractual right to collect water rates other than those

fixed in the mode prescribed by its charter.     This is shown so clearly by Judge Ross in Santa Ana Water Co. v. Town of San Buenaventura, 56 Fed. 347, 348, already mentioned, that I quote from his opinion as follows:

"In the case entitled Water Works v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48, the question arose whether the right conferred upon water companies organized under that act to participate in the fixing of the rates to be charged for water furnished by them constituted a contract protected by the constitution of the United States against impairment by subsequent action of the state. The court held that the provision in the statute of 1858 in respect to the fixing of water rates was but one of the corporate privileges granted by the state; that it was part and parcel of the charter of the corporation, and nothing else, and therefore fell within the power conferred by section 31, art. 4, of the constitution of the state, in existence when the act was passed to alter or repeal it.     Chief Justice Waite, in delivering the opinion of the court, said: 'The organization of the Spring Valley Company was not a business arrangement between the city and the company, as contracting parties, but the creation of a new corporation to do business within the state, and to be governed as a natural person or other corporations were or might be.     Neither are the charter rights acquired by the company under the law to be looked upon as contracts with the city and county of San Francisco.     The corporation was created by the state.     All its powers came from the state, and none from the city and county.     As a corporation it can contract with the city and county in any way allowed by law, but its powers and obligations, except those which grew out of contracts lawfully made, depend alone on the statute under which it was organized, and such alterations and amendments thereof as may from time to time be made by proper authority.     The provision for fixing rates cannot be separated from the remainder of the statute by calling it a contract.     It was a condition attached to the franchises conferred on any corporation formed under the statute, and indissolubly connected with the reserved power of alteration and repeal.'     It will be observed that while the court held that each and every right conferred by the statute under which the company was incorporated was a part and parcel of its charter, and that only, and therefore subject to alteration or repeal, the right of any company to contract with the city or town in any way allowed by law was expressly recognized and declared."

Judge Ross, later, at page 351, after referring to People v. Stanford, supra, announces his conclusion on the point under consideration as follows:

"The construction placed upon the constitution of the state by the highest court in existence under it is binding on this court, and, under the construction thus adopted by the supreme court of California, it is obvious that the complainant corporation was competent to take by assignment whatever rights the contract of January 4, 1869, conferred upon Arnaz and his associates, and that were assignable by them."

Complainants urge another ground in support of the contract, namely, that, if it was made without original authority on the part of the city, it has been subsequently validated by the act of April 2, 1870, which, so far as material here, is as follows:

"Section 1. The following acts, contracts and ordinances of the mayor and common council of the city of Los Angeles are hereby ratified and confirmed: The contract and lease for the care and maintenance of the Los Angeles City Water Works, entered into and made between the mayor and common council of the city of Los Angeles, on the one part, and John S. Griffin, Prudent Beaudry and Solomon Lazard, on the other part, dated the twentieth (20th) day of July, eighteen hundred and sixty-eight (1868); and also the ordinance confirmatory of the same, passed July the twenty-second (22d) eighteen hundred and sixty-eight (1868) which contract and ordinance are recorded in

the office of the county recorder of Los Angeles county, in Book one of Miscellaneous Records, pages four hundred and twenty-eight (428) to four hundred and thirty-one (431). * * *" St. Cal. 1869–70, pp. 635, 636.

Defendants argue that the effect of said act, if operative, would be to confer a franchise on the Los Angeles City Water Company, and therefore the act is violative of that provision of the constitution of the state, then in force, prohibiting the creation of private corporations by special act; citing Road Co. v. Cole, 51 Cal. 381, City and County of San Francisco v. Spring Valley Water Works, 48 Cal. 493, and other cases. The provision of the constitution referred to (article 4, § 31) is as follows:

"Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes."

This argument of defendants seems to me to be unsound. Assuming, for the purposes of said argument, that the city of Los Angeles was not originally authorized to make the contract of July 22, 1868, still I think that the equivalent of such authority was supplied by said act of April 2, 1870, and said contract thereby made as valid as it would have been had full authority existed from the outset. Whatever a legislature may originally authorize, it can, if the constitution under which it exists interposes no obstacle, subsequently ratify; and such ratification is equivalent to an original grant of power, operative by relation, as of the date of the thing ratified. This, according to all the authorities, is the theory and effect of a ratifying act.

"Ratification, as it relates to the law of agency, is the express or implied adoption of the acts of another by one for whom the other assumes to be acting, but without authority; and this results as effectually to establish the duties, rights, and liabilities of an agency as if the acts ratified had been fully authorized in the beginning." 1 Am. & Eng. Enc. Law (2d Ed.) p. 1181. "By the ratification of the unauthorized act the relation of principal and agent, with all the rights and duties incident thereto, is as fully established as if the authority had been conferred originally. The ratification relates back to the time of the performance of the acts, as expressed in the familiar maxim, 'Omnis ratihabitio retrotrahitur et mandato priori æquiparatur' " (Id. p. 1213); that is, "Every subsequent ratification has a retrospective effect, and is equivalent to a prior command" (1 Bouv. Law Dict. p. 220).

Again it has been said:

"Until ratification, no liability to principal exists; but, after ratification, liability relates back to the time when the obligation was undertaken. In other words, to adopt the exposition of an eminent German commentator, when an agent undertakes an act for another person, the legal character of the act remains undetermined until such other person decides whether or not he will ratify. The contract is not void, but occupies the same position as one that is conditional. The third party contracting is bound from the time of the institution of the contract, and not merely from that of the ratification. The agent cannot, even in this intermediate period, release the third party from liability. A fortiori such release is not worked by the intervening death or other incompetency of the agent. * * * It has just been noticed that the principal, by the act of ratification, puts himself in his agent's place. From this it follows that the ratification acts retrospectively; and nowhere is this more unhesitatingly expressed than in the Roman law. The principal, so that law assumes, puts himself, by the ratification, back into the period in which the contract was executed. * * * Whart. Ag. §§ 76, 77.

In Supervisors v. Brogden, 112 U. S. 261, 5 Sup. Ct. 125, the court said:

"Since what was done in this case by the constitutional majority of qualified electors, and by the board of supervisors of the county, would have been legal and binding upon the county had it been done under legislative authority previously conferred, it is not perceived why subsequent legislative ratification is not, in the absence of constitutional restrictions upon such legislation, equivalent to original authority."

Further in the same case the court quotes from Sykes v. Mayor, etc., 55 Miss. 137, as follows:

"The idea implied in the ratification of a municipal act performed without previous legislative authority is that the ratifying communicates authority, which relates back to, and retrospectively vivifies and legalizes, the act, as if the power had been previously given. Such statute is of the same import as an original authority."

See, also, Grogan v. City of San Francisco, 18 Cal. 590; People v. Brooks, 16 Cal. 27; Ralphs v. Hensler, 97 Cal. 296, 32 Pac. 243; Zottman v. City of San Francisco, 20 Cal. 97; and Taylor v. Robinson, 14 Cal. 396.

From these authorities it results that the act of April 2, 1870, is, in legal contemplation, the same as an act conferring power originally upon the city to make the contract with Griffin and his associates. Such, indeed, is the admission of defendants themselves, in one paragraph of their brief, which is as follows:

"The act does not purport to vest in the city the power generally to make contracts with reference to providing a supply of water, but it attempts to confirm a particular contract, and is of exactly the same nature as if an act had been passed, prior to the execution of the contract, specially authorizing the city to enter into it."

Now, if the legislature had passed an act, prior to the execution of the contract with Griffin, Beaudry, and Lazard, specially authorizing the city to enter into said contract with said parties, such an act would have been valid; for, as already shown, the constitutional inhibition against the creation of private corporations by special legislation does not include grants of franchises to individuals.

My views in regard to that clause of the contract of July 22, 1868, now under consideration, wherein the city agreed that it would not reduce water rates below those charged at the date of the contract, may be summarized thus: The city of Los Angeles, by virtue of the acts of April 4, 1850, and March 11, 1850, hereinbefore mentioned, which constituted the original charter of said city, was authorized to make said agreement; and, further, if such original authority did not exist, the agreement was validated by the ratifying act of April 2, 1870. These views render unnecessary the determination of the question of estoppel urged by complainants in their last brief.

2. The next defense to the suit is that there is no proof that the rates fixed by the ordinance of 1897 are less than the rates that were charged by the assignors of the water company at the date of the contract, July 22, 1868. The evidence adduced on this point consists of a report, made in 1870, of a joint committee of the city and water company, appointed for the purpose of fixing water rates, which report states, in substance, among other things, that said committee had

established water rates, taking as a guide the rates charged in 1868, and a similar report made in the year 1874, which reports were accepted and approved by the mayor and council of the city of Los Angeles. Defendants insist that the statements in said reports that the committee had taken as a guide the rates charged in July, 1868, are hearsay declarations of a committee of the council, not binding upon the city; citing 1 Dill. Mun. Corp. (4th Ed.) § 237, note on pages 321, 322. I have examined the cases below mentioned, which are among those cited by Judge Dillon in the note referred to, and find that, so far from sustaining, they antagonize, defendants' contention. The rule, as I gather it from these cases, is this: A corporation, municipal as well as private, is bound by the declarations of its officers, where such declarations accompany, and are explanatory of, an act done by the officer in the scope of his authority. Glidden v. Town of Unity, 33 N. H. 571; Lasalle Co. v. Simmons, 10 Ill. 516; Railroad Co. v. Ingles, 15 B. Mon. 637; Gray v. Rollingsford, 58 N. H. 253; Bridge Co. v. Betsworth, 30 Conn. 380; Grimes v. Keene, 52 N. H. 330.

The following extract is from Glidden v. Town of Unity, supra:

"In all American courts, towns and other corporations are now to be considered as subject to the same presumptions and implications arising from their corporate acts or the acts of their agents, within the scope of their authority, without either vote, deed, or writing, as in the case of natural persons. Vide authorities collected in 2 Kent, Comm. 290, and Ang. & A. Corp. 212. They may be bound by the express promise of their agents or officers, acting within the scope of their authority, or such promise may be implied against the corporation from the acts of its agents within their authority, as in the case of natural persons. Smith v. First Cong. Meeting House, 8 Pick. 178; Bellows v. Bank, 2 Mason, 31, Fed. Cas. No. 1,279.

In Lasalle Co. v. Simmons, supra, the court says:

"The declarations of the commissioners respecting the payment of the money were not competent evidence against the county. They were not made by them while officially representing the county in this transaction. The declarations of an agent, while engaged in the business of his principal, respecting a particular matter then depending, are a part of the res gestæ of the transaction, and binding on the principal; but those made out of the course of the agency, when the agent is not acting for the principal in the particular transaction concerning which they are made, are mere hearsay, and not admissible in evidence against the principal. 1 Greenl. Ev. §§ 113, 114; Story, Ag. §§ 134, 135."

In Railroad Co. v. Ingles, supra, the court said:

"The doctrine is well settled that, where the acts of the agent will bind the principal, there his representations and statements respecting the subject-matter will also bind him, if made at the same time, and constituting part of the res gestæ. Wherever what the agent did is admissible in evidence, then whatever he said on the subject while doing it is also evidence against the principal. The court therefore did not err in admitting this testimony."

The committees above mentioned were in the performance of the duty expressly enjoined upon them by the city, and the statements in their reports that they had followed the rates charged in July, 1868, were explanatory of the rates they established, and therefore said statements are clearly within the rule enunciated by the foregoing authorities. The same remark applies to the actions of the council and mayor in accepting and approving said reports.

Defendants further suggest that it does not appear from said statements whether the time referred to in July, 1868, was prior or subsequent to the 22d day of that month, the date of the execution of the contract. This suggestion, I think, is without force. The statement is that the committee established rates, etc., "taking as a guide, as near as can be, the charges and rates for domestic purposes charged in July, 1868." The obvious meaning of this statement is that the charges and rates therein referred to prevailed, not merely on a particular day in July, but during said month. I hold that the reports above mentioned, and the actions of the city council and mayor thereon, show that the rates fixed in said report of 1870 were the rates charged by the assignors of the water company July 22, 1868.

3. The next defense relied on is that complainants are not entitled to a decree annulling the ordinance of 1897 for the reason that complainants have violated, and are still violating, a material provision of said contract, by taking from the Los Angeles river more than 10 inches of water, measured under a 4-inch pressure; citing Pom. Eq. Jur. §§ 1341, 1407. Defendants admit that all the water taken from the river prior to October 20, 1896, was taken with the consent of the city, as provided in the contract, and it does not appear that a greater quantity was being taken when this suit was commenced, March 4, 1897, than was taken in October, 1896; but defendants claim that said consent was withdrawn on the date above mentioned, October 20, 1896. If it be conceded, as claimed by defendants (which, however, I do not decide), that the provision of the contract limiting the quantity of water to be taken from the river without the previous consent of the city is sufficiently certain for enforcement, or, more specifically, that said quantity is 10 inches, measured under a 4-inch pressure, still the consent of the city to the taking of a greater quantity, once given, cannot be withdrawn during the life of the contract, for the reason that large expenditures have been made by complainants in reliance upon such consent. Rhodes v. Otis, 33 Ala. 600; Woodbury v. Parshley, 7 N. H. 237; Lacy v. Arnett, 33 Pa. St. 169; Russell v. Hubbard, 59 Ill. 337; Beall v. Mill Co., 45 Ga. 33; Veghte v. Power Co., 19 N. J. Eq. 153; Railroad Co. v. Battle, 66 N. C. 546. The rule enunciated in the foregoing citations has also been recognized and applied in California. Flickinger v. Shaw, 87 Cal. 126, 25 Pac. 268; Grimshaw v. Belcher, 88 Cal. 217, 26 Pac. 84; Smith v. Green, 109 Cal. 228, 41 Pac. 1022. From the syllabus of the case last cited I quote as follows:

"As a general rule, one who rests his claim to an easement on a verbal contract alone, unexecuted and unaccompanied by any other facts, has no rights thereto which he can enforce; yet where a parol license to take half the waters of a stream has been executed, and investments have been made upon the faith of it, the license is irrevocable."

4. Defendants further contend that complainants have so acquiesced in the action of the council in the fixing of water rates as to estop them from maintaining the present suit, and also have been guilty of such laches in not sooner seeking an injunction

against the infringement of their rights as is fatal to the relief they now seek. This contention, in my opinion, is not well taken. So far from the action of the city council having been acquiesced in by the complainants, it has been the subject of repeated protests. But, even if the complainants had not protested, their acquiescence in ordinances establishing rates prior to the year 1896 would not be acquiescence in the ordinance of that year, for the obvious reason that the last-named ordinance made a greater reduction of rates than any previous ordinance. Without reference, however, to the facts that the ordinances of 1896 and 1897 made greater reductions than had been made in previous ordinances, it may be stated broadly that acquiescence in an ordinance passed one year cannot be acquiescence in an ordinance passed the succeeding year. The ordinances passed consecutively through a series of years, beginning, for instance, with 1880, and extending down to 1889, were not one continuous act infringing complainants' rights, but each ordinance was a separate and distinct infringement, and therefore acquiescence in one does not estop the complainants from assailing another.

5. Defendants further contend that if the limitation in the contract of July 22, 1868, upon the power of the city to fix water rates, be valid, the ordinance of 1897 is void upon its face, and does not throw any cloud upon complainants' rights under said contract, nor expose their property to forfeiture, and therefore complainants have adequate remedies at law, by actions for collections of water rates; citing Water Works v. Bartlett, 16 Fed. 615; Alpers v. City and County of San Francisco, 32 Fed. 503; and Murphy v. East Portland, 42 Fed. 308. This contention is erroneous, in its assumption that the ordinance referred to is void upon its face, and, besides, is fully answered by the decision on demurrer in the case of Santa Ana Water Co. v. Town of San Buenaventura, supra. That case, so far as concerns the question of equitable jurisdiction, is in all essential respects similar to the case at bar. This is not true, however, of any of the three cases cited by defendants in this connection. Moreover, two of said cases (Alpers v. City and County of San Francisco, supra, and Murphy v. East Portland, supra), so far from supporting, are, in one respect, against, defendants' contention. They hold, it is true, that the judiciary will not restrain the passage by a municipal corporation of a proposed ordinance upon a matter within the legislative discretion of such corporation; but they at the same time expressly recognize the competency of the courts, after the passage of such an ordinance, to annul or arrest its enforcement if it be unconstitutional. The case mainly relied on by defendants, however, is that of Water Works v. Bartlett, supra, in which the court held that the proposed ordinance, whose adoption was sought to be restrained, if void at all, was void on its face, and that, because everybody is presumed to know the law, no injury could result therefrom. The very essence of the rule there enunciated by Judge Sawyer is that the facts which nullify the ordinance must appear from its inspection; the theory being that since the facts appear

upon the face of the ordinance, and everybody is presumed to know the law applicable to such facts, the ordinance is a proclamation of its own nullity, and therefore cannot, in contemplation of law, be productive of harm.  Thus, it will be seen that the rule is extremely technical; and Judge Sawyer himself, while enforcing it, as he in effect says, under the constraint of precedents, freely criticises its severity.  In order to justify the application of such a rule, every requirement of it should be fully met.  The reason why the ordinance in Water Works v. Bartlett, supra, if void at all, would have been void upon its face, was that the alleged contractual rights which it attempted to devest were granted by an act of the legislature of California (that of April 22, 1858), which act, without pleading or proof, was within the court's knowledge.  In the case at bar, however, the ordinance, upon its face, is valid; and its invalidity appears only when considered in connection with the contract of July 22, 1868, and evidence showing what the water rates were at that date.  While the court takes judicial notice of the ratifying act of April 2, 1870, still, since the provisions of the contract of July 22, 1868, are not embodied in said act, I am not sure that said provisions are matters of judicial knowledge, although such seems to be the ruling of the court (one of the justices dissenting) in Brady v. Page, 59 Cal. 52.  Conceding, however, that the court will take judicial notice of all the provisions of said contract, still the one in question simply provides that water rates shall not be reduced below the rates then charged without indicating what those rates were; and therefore the invalidity of the ordinance appears, not upon its face, but only in connection with extraneous evidence of what the rates were in July, 1868, and for this reason complainants have adduced that evidence in the present case.

Defendants, in one of their briefs filed on demurrer, discussing the branch of the case now under consideration, say:

"The position of complainants' counsel seems to be that, merely because they can contemplate the possibility that they are intended to be included within the provisions of the ordinances which are attacked here, they can obtain the declaration of this court that the acts of the council are void, irrespective of the question whether anything is ever done to infringe their rights of property or not.  In other words, they claim that they are entitled to have the theoretical question of law, concerning the validity of their contract and the invalidity of the ordinance in question, determined by this court merely for their own satisfaction, and without showing that any irreparable damage will ensue if the contract is valid, and the ordinances are void.  If the contract is void, and the ordinances are valid, the complainants have no equity; and if, on the other hand, the contract is valid, and the ordinances are void, then no damage can result to complainants, in contemplation of law, as the city is not doing or attempting to do anything that will in any way interfere with the property of complainants."

These comments do not correctly present the situation as disclosed by the pleadings and proofs.  Under the circumstances of this case, the ordinance itself is an infringement of complainants' property rights, because it hinders them in the collection of that compensation, to which they are entitled under the contract of 1868; and it is idle to say that relief cannot be had in equity

'because the power and duty of the city ended with the passage of the ordinance, and no effort is now being made by the city for its enforcement. The ordinance, by reason of the severe pains and penalties which apparently fortify it, is daily, hourly, and momentarily enforcing itself. The defendants must either submit to the terms of the ordinance, or incur unusually onerous expenditures. It is reasonably certain that if, with the ordinance standing, they were to undertake the collection of rates in excess of those prescribed in the ordinance, they would be resisted at every point by the consumers of water, and thus be driven to innumerable actions at law. Besides, should they, in any instance, succeed in collecting without an action a higher rate than the ordinance prescribes, it is equally certain that they would thereby bring upon themselves protracted and heavy litigation, having for its object forfeiture of their entire system of works. Surely these injuries are irreparable, and actions at law, so far from being adequate to the exigencies of the situation, are, as complainants, in their brief, forcibly put it, mere mockeries of a remedy.

Defendants further suggest that the equitable relief prayed for by the complainants ought not to be granted for the reason that a decree annulling the ordinance of 1897 could not become final until affirmed on appeal by a court of last resort, and that before this could take place the year for which the ordinance was passed will have expired. This suggestion, in my opinion, is without force. If the views, which I have already expressed are correct, complainants' rights under the contract of July 22, 1868, cannot be adequately protected in any other way than by an annulment of said ordinance; and the possibility or probability that the enforcement of a decree to that effect may be postponed by an appeal until the ordinance expires of its own limitation affords no reason for a denial by this court of the relief, to which it finds the complainants entitled. In San Diego Water Co. v. City of San Diego, 118 Cal. 556, 50 Pac. 633, which was a suit to annul a city ordinance, the trial in the lower court was had after the expiration of the year covered by the ordinance; and, although the decision of the supreme court in bank was not rendered until more than six years thereafter, and specially adverts to the date of the trial in the lower court, the case was sent back for a new trial.

My conclusions are that the contract of July 22, 1868, between the city of Los Angeles and the assignors of the water company, in so far as said contract provides that the city shall not reduce water rates below those charged at said date, is valid, and that the ordinance of 1897, which was passed pursuant to constitutional and legislative requirements of the state of California, does reduce water rates below the minimum so prescribed, thereby impairing the obligation of said contract, and should be annulled. A decree conformable to this opinion will be entered.