Wilson, P. J.
On and prior to February 14,1901, there was in *348 the city of Denver only one electric light and power plant capable of supplying an electric current for the lighting of the streets of the city, the homes of its inhabitants, and for commercial purposes generally. Up to January, 1900, this company under contract with the city had lighted the streets, receiving therefor the sum of one hundred dollars per annum for each arc light. Subsequent to this time, and up to the completion of the new plant hereinafter mentioned, the company had furnished such street lighting, but not under contract with the city, and had been receiving therefor the sum of ninety dollars per annum for each arc light. On February 14, before mentioned, the council of the defendant city passed an ordinance whereby Charles F. Lacombe, one of the appellants, and his assigns, were granted the right and privilege to construct, maintain and operate in the city a street arc electric light and power plant, and also a commercial electric light and power plant, for the purpose of producing and transmitting an electric current for lighting, heating and power purposes, for use of the said city of Denver, and residents and citizens thereof, and to erect poles, string wires,, etc., along the streets and alleys of the said city for this purpose. Specifications and conditions were inserted as to where and how the plant should be constructed, its kind, capacity, etc. The ordinance further provided for, and upon its acceptance by Lacombe and his assigns was a contract between the city and Lacombe for lighting the streets, and a similar contract, other than the one arising from the acceptance of the ordinance was executed between the city and Lacombe. The construction of the arc lighting plant was to be completed within ninety days, and of the commercial plant within four months from the passage of the ordinance. The contract was for the lighting of the streets of. the city for a period of *349 ten years at the price of $7.50 per month, or $90.00 per annum for each arc light, and for such additional arc lights in excess of one thousand as might be required by the city during the continuance of the contract, the sum of $70.00 per year per arc light. The city covenanted that it would use not less than one thousand arc lights. The ordinance and contract reserved the right to the city to purchase the arc lighting plant at the end of any year at a constantly reducing price, which was fixed for each year in the contract, and it was also provided that the plant should not be sold to or combine with any other electric lighting plant in the city. With reference to the commercial plant, a maximum rate to be charged private consumers, residences, business houses, etc., was fixed, and it was provided that the city might purchase this plant at the end of five-year periods, at a price to be fixed in manner provided in the ordinance. It was further agreed that Lacombe and his assigns should pay into the city treasury three per cent per annum of the gross revenues that might be received from the commercial plant. In an agreed statement of facts, it was stipulated that the city had not at any time appropriated a definite sum of money, or any amount of money whatever, for the liquidation of any liability which it might incur' by reason of such ordinance or contract, unless the ordinance itself operated as an appropriation, except by the passage of the annual appropriation ordinance of the city on January 17, 1901, which contained the following provision:
“Electric Light and Gas. There is hereby appropriated to the electric light and gas department the sum of ninety thousand dollars ($90,000) for the public lighting of the streets of the city of Denver by arc electric lights of two thousand standard candle-power, running all night, every night in the year, and also for *350 the payment of gas and electric light bills in the different city buildings, outside of the fire and police departments. Provided, that not more than one-quarter of said amount shall be expended in any one quarter of the year, unless authdrized expressly by the city council. Provided, further, that not more than ninety dollars each per annum shall be paid for arc electric lights of.two thousand standard candle-power each. And the city council hereby reserves the right .to direct the expenditure of the amount hereby appropriated as said council may from time to time determine. ’ ’
It was further stipulated that neither the contract with Lacombe and his assigns, nor the expense to the city resulting therefrom, was rendered necessary by any casualty, accident or unforeseen contingency happening after the passage of the last annual appropriation ordinance by the city council of the city of Denver, and that neither the ordinance nor the contract had ever been recommended or approved by the board of public works, nor had the said hoard of public works, nor the city, nor any officer or department thereof, in any manner advertised for bids for lighting the streets and public grounds of the city. It was further stipulated that the ordinance was passed and the contract entered into by the city in order to afford the city and its inhabitants the benefit of competition in the price of electric light and power between the old company and the proposed new company ; and that it was impossible to secure the benefits of such competition and the erection of a competing plant, without entering into the contract set forth in the ordinance, with Lacombe and his assigns, or some other company, corporation or person. Also, that since the commencement of this action, the old company had for the purpose of meeting the competition afforded by defendant Lacombe and his as *351 signs, materially reduced the rates charged by it for commercial lighting. It was also agreed that-at the time of the commencement of this action, the amount of the appropriation for .the lighting of the streets and buildings of the city in the. annual appropriation ordinance of January 17,1901, remained unexpended, with the exception of about eleven thousand dollars paid out for lighting subsequent to January 1, 1901. The plaintiff, a taxpayer of the city, commenced this suit February 16, 1901, assailing the validity of the ordinance and contract, and praying an injunction restraining the defendants from carrying it into effect. The decree of the court granted the relief substantially as prayed for, the contract being held null and void, and from this defendants appeal.
To establish the invalidity of this ordinance and contract, the grounds chiefly relied upon are:
1. That it was in violation of and prohibited by the constitution of the state.
2. That it was and is prohibited by the charter of the city of Denver.
There are some other objections which possibly may not in terms come strictly within these two grounds, but they will be adverted to and considered during the course of this opinion.
1. The constitutional objection is based upon the provision of the state constitution limiting the extent and amount of municipal indebtedness, it being claimed that this contract would operate to create a municipal indebtedness in excess of the constitutional limit. — State Constitution, art. 11, sec. 8.
It was stipulated that at the time when the contract was entered into, the indebtedness of the city had not reached the constitutional limit by the sum of $225,000.00. If therefore the contract created an indebtedness such as was embraced within the constitutional inhibition, and such indebtedness was for the *352 aggregate amount of the total minimum payments to he made during the ten-year life of the contract, to wit, the sum of nine hundred thousand dollars, it is apparent that the constitutional limitation would of course be exceeded. If, however, even though it be conceded that the contract did create a debt within the meaning of the constitution, but the debt was only in the amount to be paid in any one year, to wit, ninety thousand dollars, then the indebtedness so created would not exceed the constitutional limitation. There is much force in the contention that a contract like this does not create a debt within the meaning of the constitution, and that no debt exists or comes into being until after the expiration of a period fixed in the contract for payment, and this is the view taken by many highly respectable authorities. It is not necessary, however, for the determination of this appeal that this question should be considered and definitely passed upon. It is immaterial for the purposes of this case how that question may be settled, because if the mere execution of the contract created a debt at all within the purview of this constitutional provision, the extent of the debt was only the amount of the annual payment provided for, which is ninety thousand dollars, and hence it was clearly and safely within the prescribed constitutional limitation. This doctrine, which has been much discussed, and frequently passed upon, is as applied to this class of cases founded upon sound reason and principle, and is supported by an overwhelming weight of authority. We cite in support of it a number of the leading and best considered authorities, .but by no means all. — • Walla Walla v. Walla Walla Water Co., 172 U. S. 19; Saleno v. City of Neosho, 127 Mo. 639; Water & Light Co. v. City of Lamar, 140 Mo. 156; Carlyle W. L. & P. Co. v. City of Carlyle, 31 Ill. App. 339; Crowder v. Town of Sullivan, 128 Ind. 487; Seward v. Lib *353 erty, 142 Ind. 554; City of Helena v. Mills, 94 Fed. 919; Dwyer v. Brenham, 65 Tex. 526; Stedman v. City of Berlin, 97 Wis. 512; McBean v. Fresno, 112 Calif. 167; Chicago v. Galpin, 183 Ill. 407; Cunningham v. City of Cleveland, 39 C. C. A. 218; Water Works Co. v. City of Utica, 31 Hun, 426; Water Supply Co. v. City of Ludington, 119 Mich. 481; Appeal of the City of Erie, 91 Pa. St. 398; Smith v. Dedham, 144 Mass. 177; Gas Light Co. v. New Orleans, 42 La. Ann. 188; Grant v. City of Davenport, 36 Iowa, 396; Earles v. Wells, 94 Wis. 285; 1 Dillon, Mun. Corp., 4th ed., § 136a.
In the Walla Walla case, in which all of the justices concurred in the opinion, it was said, after referring to a few cases which hold the contrary doctrine: “But we think the weight of authority, as well as of reason, favors the more liberal construction that a municipal corporation may contract for a supply of water or gas or like necessary, and may stipulate for the payment of an annual rental for the gas or water furnished each year, notwithstanding the aggregate of its rentals during the life of the contract may exceed the amount of the indebtedness limited by the charter. There is a distinction between a debt and a contract for a future indebtedness to he incurred provided the contracting party perform the agreement out of which the debt may arise. There is also a distinction between the latter case and one where an absolute debt is created at once, as by the issue of railway bonds, or for the erection of a public improvement, though such debt he payable in the future by installments. In the one ease, the indebtedness is not created until the consideration has been furnished; in the other, the debt is created at once, the time of payment being only postponed. In the case under consideration, the annual rental did not become an indebtedness within the meaning of the charter, until *354 .the water appropriate to that year had been furnished. ’ ’
In an elaborate note to Beard v. City of Hopkinsville, 44 Am. St. Rep. 223, by Judge Freeman, the distinguished legal author, on this subject of what is within the meaning of prohibitions against municipal indebtedness, it was said on page 240: “But where the contract or ordinance is one intended to provide for the furnishing of the municipality with water to be used for public purposes, or with lights for the streets or other public places, and payment is to be made for such water or lights from year to year, this is but a mode of providing for the necessary current expenses of the municipal government, and while it is true the municipality has no discretion not to become liable from year to year for the amount which it has agreed to pay, yet the almost overwhelming weight of authority is that it is not to be regarded as indebtedness within the meaning of these constitutional or statutory limitations, except for the amount which has actually fallen due under the contract or ordinance, and that it must therefore be sustained, although the amount which will ultimately become due under it may greatly exceed the limit of indebtedness which the municipality is authorized to incur.”
In Saleno v. City of Neosho, supra, cited approvingly in the Walla Walla case, supra, the court said: “A debt is understood to be an unconditional promise to pay a fixed sum at some specified time, and is quite different from a contract to be performed in the future depending upon a condition precedent, which may never be performed, and which cannot ripen into a debt until performed. Here the hydrant rental depended upon the water supply to be furnished to defendant, and if not furnished, no payment could be required of it.”
*355 There are some cases to the contrary, bnt upon close examination it will be found that in the great majority of them the decision turned upon the fact that the municipality at the time of making the contract had already reached the limit of its indebtedness, or so nearly so, that the making of the first annual payment would have carried it beyond such limit, or that in the constitution other language or words beside the mere word “debt” or “indebtedness” was used, showing an intent to give to the word “debt” a more extended meaning and broader significance than that usually accorded to it. Nearly all are susceptible of some explanation which shows them to be not in conflict with this doctrine. Such are the Montana cases, cited by the appellee—Davenport v. Kleinschmidt, 6 Mont. 502; State v. Helena, 24 Mont. 521.
Both of these cases were considered by the federal circuit court of appeals in a late Montana case, City of Helena v. Mills, 94 Fed. 917. It was there said, referring to them: “Both cases are in harmony with the general doctrine, established by the decided weight of authority- -that the contract of a municipal corporation for a useful and necessary thing, such as water or light, which is to be paid for annually as furnished, does not create an indebtedness for the aggregate sum of all the yearly payments, since the debt of each year comes into existence only when the annual compensation has been earned, but that if the amount agreed to be paid in any installment in compliance with such contract transcends the amount of permitted indebtedness, the city is not liable therefor.”
Lake County v. Rollins, 130 U. S. 662, is explained in the Walla Walla case, supra, and held not to be in conflict with the doctrine announced in the latter case.
*356 Niles Water Works v. Niles, 59 Mich. 313, is cited as maintaining the contrary doctrine. The question there presented though somewhat similar, was not exactly like the one now under discussion. The case seemed to turn upon the exceedingly broad and comprehensive language used in a provision of the charter of the defendant city under consideration. However this may be, the Michigan supreme court in a much later and very recent case, Water Supply Co, v. City of Ludington, supra, passed directly upon the question here presented. It said: “ The charter itself limited the authority of the' council with respect to incurring indebtedness, but the rule that a contract for future services to be paid for as rendered is not an incurring of indebtedness, is supported by binding authority. ’ ’ In support of this, the court cited a number of authorities which are cited in the Walla Walla case, and which we have cited in this.
In Water Co. v. Salem, 5 Ore. 29, the charter inhibition involved was as broad and comprehensive as language could make it. The city was prohibited from creating ‘ ‘ any debt or liabilities which shall singly or in the aggregate exceed the sum- of one- thous- and dollars.” The case arose upon a contract for water whereby the city bound itself to pay in quarterly installments eighteen hundred dollars per annum for a period of seventeen years. The main and only question to be determined was whether any debt or liability was created by the contract. Upon that question only the case is authority, but that is not the question before us. Manifestly if that contract created a debt or liability for one year only, it would have been void, because the debt or liability would have been in excess of the amount allowed by the city charter. Whether the debt or liability, if - created, would have been only the amount to be paid during one year, or the sum of the payments provided to be *357 made during the entire seventeen years, was not in the case.
There are a few cases of very respectable authority squarely to the contrary, notably one from Georgia, City Council v. Dawson Water Works Co., 106 Ga. 697, 32 S. E. 907. This involved a contract by the city for water, annual payments for which in specified amounts were to continue for a period of twenty years. It was held that within the meaning of the state constitution and intent of its framers, the contract created a debt the aggregate amount of which was the sum of the annual rentals stipulated to be paid during the entire term, and therefore that it was illegal and not binding except for the first year. It plainly appears that in reaching this conclusion the court was influenced to a large extent by a consideration of the history of the peculiar state of public affairs existing in Georgia antecedent to and concurrent with the adoption of the constitutional inhibition. This it was held clearly evidenced the intent of the convention to have been in accord with the conclusions of the court. It was frankly stated in the opinion, howevei, (p. 914) that the ruling of the court was “in direct conflict with a decision of the highest court in the land as well as with the current of American authority on the subject.” It does not appear to us from current history or otherwise that the condition of public affairs in Colorado at the time when its constitution was adopted was such as to justify us in following the Georgia precedent and in thereby ignoring the current of American authority, including a unanimous decision of the highest court in the land.
Finally, it may be said as showing that the doctrine announced by the weight of authority is supported by reason and principle, that a contrary holding would, it is a matter of common knowledge, in numerous instances work disaster to municipalities *358 and their inhabitants. Water and light are absolute necessities in towns and cities, as essential almost as air, and the construction and operation of plants for these necessities, it is universally known,, require the expenditure of very large sums of money. As a business proposition, susceptible of being understood by those of ordinary intelligence only, it is also universally known and recognized that a town or city is unable to secure the erection of the necessary plant unless it is able to contract in advance with such person or company to use light to be furnished for some period of time. As said by this court in Gas Company v. Leadville, 9 Colo. App. 403: “If a city were not allowed in such case to contract for light for some reasonable period of time, and the individual or company furnishing light was compelled to trust for his compensation from year to year to the varying moods of city councils, it is safe to say that no one would engage in such a hazardous enterprise. ’ ’
For these reasons, we believe that neither the ordinance nor the contract was obnoxious to the state constitution.
2. Was the contract invalid and void ab initio because of the failure on the part of the city council to make the necessary prior appropriation of money to cover the debt or liability created thereby, as required by section 10, article 6, of the city charter then in force, which reads as follows:
‘ ‘ The city council shall not order the payment of any money for any purpose whatever, in excess of the amount appropriated for the current year, and at the time of said order remaining unexpended in the appropriation of the particular class or department to which such expenditures belong. Neither the city council nor any officer of the city shall have authority to make any contract, or do anything binding on the city, or imposing upon the city any liability to *359 pay money, until a definite amount of money shall have been appropriated for the liquidation of all pecuniary liability of the city under any such contract, or in consequence thereof; said contract to be db initio null and void as to the city for any other or further liability;
“Provided, first, that nothing herein contained shall prevent the city council from paying any expense, the necessity of which is caused by any casualty, accident or unforeseen contingency, happening after the passage of the annual appropriation ordinance; and second, That the provisions of this section shall not apply to or limit the authority conferred by sections 7, 8 and 9 of this article, nor to moneys to be collected by special assessments for local improvements.”
Sections 7, 8 and 9, which are excepted from the provisions of this section, are sections empowering the city to contract indebtedness for any one or more of various purposes specifically mentioned therein, but public lighting is not one of them. It is admitted that in .January, immediately preceding the time when this contract was entered into, the city council in its annual appropriation bill included an item of $90,000.00, for the public lighting of the streets of the city by electric lights, and also for the payment of gas and electric ■ light bills in the different city buildings during the current year. It is true that it was not recited in the bill that this appropriation was for the express purpose of paying the bills which might be incurred under this contract, designating the company or contractor by name, but we think this was not necessary. It covered the subject of lighting, and that was entirely sufficient to meet the requirements of the section which we have quoted, so far as the expense incurred under this contract for lighting during the first year was concerned. It is contended, *360 however,. by counsel, and it was upon this ground .that the trial court based its judgment, that as the contract was to run for ten years, in order to have validated it the appropriation should have been for the total amount that the city would have to pay to the company during the entire ten years if it. complied with its contract, to wit, the sum of nine hun.dred thousand dollars. Even though we should hold, as we have done, that the contract was not obnoxious to the constitutional provision fixing a limit of indebtedness, because the indebtedness within the meaning of that provision was only from year to year, counsel urge that the section of the charter which we have quoted covers the aggregate amount of the indebtedness to be incurred for the entire term of years, because the word “liability” is used in the section, ,and not “debt” or “indebtedness.” It is insisted that the word “liability” has a much broader and more• extended significance than the term “debt.” This is true, and we have no dispute with or criticism of the argument of counsel to that effect, or the .authorities cited by them in support of it. It is equally true, however, that the words are sometimes used interchangeably, as synonymous, and in the construction of a statute whether this is the case may be judicially determined from the context — from the sense and connection in which it is used. The very authorities which counsel have cited in support of their position, are authorities to this effect. In Cochran and Sayre v. United States, 157 U. S. 296, the meaning of the word was determined by a consideration of the plain object of'the statute. In Salem Water Co. v. City of Salem, supra, the inhibition of the statute extended both to “debt and liability.” Both .words were used, and the court because of this concluded that it was the evident intent of the legislature in thus using both of the words to give to the lan *361 guage the broadest and most comprehensive significance possible, and include within the inhibition every character of liability, absolute or contingent, express or implied.
Applying these rules of construction, we feel a clear conviction that this section as applied to contracts of this and similar character in any event does, not hear the interpretation placed upon it by either the trial court or counsel. .The charter expressly empowered the city to provide for lighting the streets and public grounds. — Art. 2, sec. 20, subdivision 8.
That it would have had such power even without this express grant is probable, hut needs no discussion. The legislature made the express grant of power, however, and in a matter of such absolute necessity, essential to the comfort and convenience of the citizens, as well as required for the protection of their lives and property, it is not to be supposed that in a subsequent section of the same act it would insert a provision which would in effect defeat the exercise of the power. As was said by this court in Gas Company v. Leadville, 9 Colo. App. 403, in passing upon a similar provision of the general law, regulating all municipal corporations excepting those organized under special charter: “If a prior appropriation was essential to the validity of the contract, then it could not have been executed at all, for the reason that it was impossible to compute the amount which would he due during the twenty-five years, even if it had the power to make such an appropriation for such a length of time, or during any part of said time. It is unreasonable to presume that the legislature required the performance of impossibilities, or that, having once expressly granted to a city the power of making such contracts as that in question, as it did in section 2655, it then in a succeeding section of the.same act.imposed such restrictions as to *362 practically nullify such grant of' power.” In this case as in that, if the theory of appellee be correct, it would have been impossible for the city to have entered into the contract at all, because it was powerless to have made the required appropriation. Under its charter, its appropriations must be made annually, and then only for expenses to be incurred during the current year. It could not make appropriations for such expenses to be incurred during succeeding years. Besides, it would have been impossible to have estimated the exact amount of money to be due in succeeding years. It could not then have been told how many arc lights would be needed for the proper lighting of the city during any of the succeeding years. The result would be that the city could not provide for the lighting of its streets, public grounds and buildings at all, unless it should go to the heavy expense of constructing and maintaining a plant of its own, which the finances of the city might not be in a condition to permit, or unless it submitted to the terms of the one company then in existence. Even if able to have built its own arc lighting plant for street lighting purposes, it would not have secured thereby for its citizens the advantages of a commercial electric light plant or of competition. While it may not be authorized specifically to make any contracts for the lighting of the residences and business houses of the people, we believe that no one would have the temerity to deny that a city in providing for public lighting within the limits and scope of its powers, would be grossly derelict in its duty if it did not use those powers, so far as possible, to advance and sub-serve the interest, not only of the corporation itself in its corporate capacity, but also of the people of the community in a matter of such paramount necessity as light. It is as we have said a matter of universal knowledge, and a fact of which all courts take judicial *363 notice in passing upon the contracts of municipalities for light and water, that the erection of a plant for the supply of either involves large expenditure of money, and especially for cities of the size and population of Denver, and that no individual or company would undertake such an enterprise without first having a contract with the city for some term of years, so as to have some reasonable business guarantee that there would be received- back from the earnings some proportion of the amount to be expended, thereby reducing the risk of the buisness venture. The result would therefore be, if the contention of appellee is maintained, that the grant of power to the city for this necessary and beneficial purpose would be practically nullified. It would in effect be saying to the municipal authorities, You may contract for the lighting of the streets, but you may not do that which is absolutely necessary to secure such a contract.
Besides, it is not necessary in order to carry out the evident purpose, intent and object of section ten, to give to it the construction contended for. This purpose was to prevent the squandering of the public money, and to compel municipalities to live within their means, within the limits of a sum fixed beforehand^ — upon, as it is called, the “pay-as-you-go” plan. Because-of this section, they could not after services were rendered, under improper or corrupt influences allow extravagant and unreasonable sums for services rendered or supplies furnished, and they could not thereby exceed the revenues of the city, and create an indebtedness which experience had shown rarely diminished, but usually increased. The same object will be accomplished if it should be held, as we do, that the city was not required to make an appropriation in this instance for any indebtedness which might be incurred during the term of years provided *364 for in the contract, unless it be for the first year. In other words, if the city during the existence of this contract in each of its annual appropriation bills appropriated a sufficient amount of money to cover its obligations to the light company which may accrue during the year, the object of the statute, and, we believe, its letter, would be complied with.
“The action of municipal corporations is to be held within the limits prescribed by statute. Within these limits they are to be favored by the courts. Powers expressly granted or necessarily implied are not to be defeated or impaired by a stringent construction.” —Kyle v. Malin, 8 Ind. 37, cited with approval in City of Pueblo v. Robinson, 12 Colo. 598, and also in Gas Company v. Leadville, supra.
In McBean v. City of Fresno, 112 Calif. 160, the court' had under consideration a contract by the city with an individual to take care and dispose of the sewage of the city for a period of five years in consideration of a certain sum per annum, to be paid quarterly. It was claimed that the contract was obnoxious to a provision of the state constitution to the effect that no city should incur, indebtedness or liability in any manner or for any purpose exceeding certain limitations. The charter of the city also provided that the trustees should not create, order or permit to accrue any debt or liability in excess of the money in the treasury that might be legally apportioned and appropriated for the purpose. Here both in the constitution and the city charter the words “debt” and “liability” were both used. The contract was held to be valid and effective, the court basing its views “upon the conviction that at the time of entering into the contract no debt or liability is created for the aggregate amount of the installments to be paid under the contract, but that the sole debt or liability created is that which arises from year to *365 year in separate amounts as the work is performed. ’ ’
See also Electric Co. v. City of Dallas, 23 Texas Civ. App. 323.
We think the same reasoning which supports the conclusion by the courts and the weight of authority which we have discussed in the first part of this opinion that in contracts of this character the word “debt” as used in the constitutional inhibition does not cover the aggregate amount to be paid for the entire term of years during which the contract runs, but only the amount for each annual period, applies with equal force and effect to the construction of this section of the city charter, and supports our conclusion that the word “liability” in the section does not within the intent and meaning of the legislature with reference to contracts of this character and nature, cover the aggregate amount to be paid under this contract for the entire term of years, but only, if the section applies at all, the amount of indebtedness or liability to be incurred during each annual period. The only reasonable conclusion is that, as applicable to contracts of this character, the word “liability” in this section has no broader significance than the word ‘ ‘ debt. ’ ’ This construction allows the section to stand and at the same time gives full force and effect to the intent and purpose of the enactment.
3. It is claimed that the city had no authority to contract for any term of years, beyond one, and that ten years is an unreasonable length of time. It is true' that the city was not given by its charter power to contract for lighting for any term of years, nor was it restricted or limited to any particular term. In fact, the charter did not specifically give it power to contract at all — to enter into any contract for lighting. The specific grant of power was to provide for lighting. This was the power expressly granted, but under all authorities the city was authorized to exer *366 cise those powers necessarily or fairly implied in, or incident to it. As a business proposition, any city, in entering into a contract of this kind, is in the exercise of its business powers. It needs no argument to demonstrate that to carry out such a power it is absolutely necessary that the city should have the power to contract — provide terms and specifications — and this, whether it undertakes to provide for lighting by building a plant of its own or by entering into a contract or agreement with a company or individual to supply the light. ' There are no specific restrictions upon the right of the municipality to contract in the exercise of this power, and there is no reason in such case why the city in the exercise of its business powers should not have the same right to contract as a natural person. Any other conclusion would be disastrous to the carrying on of the multifarious business affairs of the city, and as we have before said, it is a practical business impossibility for a city to carry out this power unless it does contract for some term of years. It has so far escaped our attention if there is a single case in the books among the vast multitude treating of contracts for lighting cities wherein the contract does not run for some term of years. As to the reasonableness of the term fixed, there being no express limit upon the power of a city as to time, the court should not undertake to interfere with the judgment of the city council, which is conversant with the needs and necessities of the city as well as existing conditions and' circumstances to .be considered in fixing the term of a contract, unless it is clearly made to appear that there has been an abuse of discretion. There is no showing here to support such a finding. Practically, the only contention is that a ten-year term is too long-because it is for ten years. In the general statutes governing all towns and cities of the state excepting Denver, and *367 possibly one town, the municipalities are authorized to contract for lighting for a term of twenty-five years. If this be a permissible term, we certainly see no reason why ten years would be an unreasonable term for the city of Denver, a municipality existing in the same state, and created by the same legislative power. Our conclusions upon this branch of the subject are amply supported by authority.—Los Angeles etc. Co. v. Los Angeles, 88 Fed. 733, Affirmed 177 U. S. 559; Conery, Jr., et al. v. Water Co., 41 La. Ann. 920; Seward v. Liberty, supra; Smith v. Dedham, supra; Water Supply Co. v. Ludington, supra; State v. Great Falls, 19 Mont. 518; L. H. & W. Co. v. Jackson, 73 Mass. 598.
Irrespective of the question as to the duration of the contract, that it was not only reasonable and highly beneficial in its terms to the city and its inhabitants is indisputable, and clearly appears from the stipulated facts. By it the city secured the public lighting at the same rate it was then paying, being a much less rate than it had paid under contract for years previous, with a still further reduction upon ■all arc lights in excess of one thousand which the future necessities of the city might require, and also a reduction in rates for light to be used by its inhabitants; also, the benefits of competition between two companies, and also a stipulation by the defendant Lacombe to pay into the city treasury annually in consideration of the privileges granted, three per cent of its gross receipts from commercial lighting, heat and power.
We see no support whatever for the contention that the contract created or tended to create a monopoly. Nowhere in the contract is any exclusive right granted. Manifestly its natural tendency and immediate effect was to prevent a monopoly. In consequence of it a new lighting plant was con *368 structed, and thereby both city and citizens were given the advantages of competition.
5. The execution of this and similar contracts is in the exercise by a municipality of its contractual, its private, proprietary or business powers, so to speak, and not of its governmental or delegated legislative powers; hence it is in our opinion not liable to the charge that the execution of the contract would for the term thereof operate as a surrender - of the legislative power of the city council. 1 Dillon, Municipal Corporations, §§ 27, 66, 68. Cunningham v. Cleveland, supra; Illinois etc. Bank v. Arkansas City, 76 Fed. 282; Los Angeles etc. Co. v. Los Angeles, supra; Seitzinger v. Electric Co., 187 Pa. St. 542.
In the Arkansas City case, supra, it was said by the court: “A city has two classes of powers, the one legislative, public, governmental, in the exercise of which it is a sovereignty and governs its people; the other, proprietary, quasi private, conferred upon it not for the purpose of governing its people, but for the private advantage of the inhabitants of the city, and of the city itself as a legal personality. In the exercise of the powers of the former class, it is governed by the rule here invoked [that the city council can make no grant and conclude no contract which will bind the city beyond the terms of their offices, because such action would circumscribe the legislative powers of their successors, and deprive them of the unrestricted exercise of their powers as the exigencies of the time might demand]. In their exercise it is ruling its people and is bound to transmit its powers of government to its successive sets of officers unimpaired. But in the exercise of the powers of the latter class it is controlled by no such rule, because it is acting and contracting for the private benefit of itself and its inhabitants, and it may exercise the. business powers conferred upon it in the same way, *369 and in their exercise it is to be governed by the same rules that govern a private individual or corporation ’ ’ — citing a large number of cases. We think this concisely and properly states the true rule.
6. It is claimed that the city council had no power to enter into the contract in question, the power to contract for public lighting being by the charter conferred upon, or committed to that branch of the executive department of the city government designated as the department of public works. The duties and powers of the board of public works are set forth in section 35, article 3 of the charter. They may be said to comprehend, generally, the exclusive management and control of the construction, reconstruction and maintenance of all public and local improvements, including the grading, paving, etc., of streets and alleys, of sewers, sidewalks, and, among other things, the “erection of poles, stringing of wires, laying of tracks, pipes and conduits for wires, whether done by the city, corporation or individuals. ’ ’ It is upon these last words that counsel base their contention. We fail to see any support for it. To the board is simply committed the power to regulate the erection of poles and the stringing of wires, because they are necessarily located in the public streets or alleys over which the board has exclusive control. We do not see how the most strained and forced construction could conclude from the language in the charter that the board has anything to do with providing for the lighting. It is true poles must be erected and wires strung before the electric, fluid can be transmitted and the light secured, but this is simply an incident to the business — one of the artificial instruments necessary to be used in common with other instruments, like the erection of the building for supplying the necessary machinery, etc. The power to provide for lighting the streets and public *370 grounds is expressly granted to the city council. In order to accomplish this the party who contracts for the lighting must make certain excavations in the street and erect therein poles and string wires, and before he can do this, the board of public works, because it has exclusive control over the streets, must designate the places where and the manner in which this work can be done so as to restrict the character of the obstruction and the danger to life and property within as small limits as possible; but how this alone can be construed to give the board of public works power to control, manage and contract for the public lighting — a power specially granted to the city council — we utterly fail to conceive. We see nothing in the entire section defining the powers and duties of the board of public works which could in our opinion by any possibility embrace the public lighting.—Electric Light Co. v. San Bernardino, 100 Calif. 350; Trenton v. Shaw, 49 N. J. Law 638.
However desirable and beneficial may be the lighting of the streets, it does not constitute a public improvement, confided to the care and control of the board of public works.
7. It is suggested, but not very strenuously urged, that the contract was unnecessary and excessive, hence unreasonable, because at the time when it was entered into, another company, The Denver Gas and Electric Company, had then in existence in full operation in the city an electric lighting plant of sufficient capacity to supply the necessities of the city and the needs of its inhabitants; that it was ready and willing to furnish the lighting, and that in fact, before the final passage of the ordinance providing for the contract in question, this company made an offer in writing to supply the public lighting, provided for in the Lacombe contract, for a period of one, three, five, or ten years as the council might elect, for the *371 price of sixty dollars per year per lamp, being thirty dollars per annum less than that provided for in the contract, and also to so amend its rates for commercial lighting that the average of its charges to private consumers should be less than a certain specified maximum amount, which we will presume was less, although the fact does not clearly appear, than the rate it had»charged for commercial lighting theretofore. This offer came too late to be effective for any purpose, either in argument or otherwise. It appears that in March, 1900, nearly a year before the entering into of the specific contract which is here under consideration, the city council and Lacombe entered into a contract precisely similar to, and identical in all its terms and provisions with the one in question in this suit. In pursuance of this, La combe commenced work and had expended as appears from the agreed statement of facts a large sum of money to carry out his contract, to wit, the sum of $300,000.00, and had incurred obligations for $150,-000.00 additional. This contract was attacked by a suit in court at the instance of some taxpayer, and claimed to be invalid because of some irregularity in the publication of the ordinance which authorized it. To avoid any question as to this alleged irregularity, the city council thought best that the ordinance should be reintroduced and re-enacted, and thereby avoid any question as to its validity. This was done in 1901, and it was while this proceeding was pending, and but a few days before the final passage of this second ordinance, that the Denver company made its offer. We think the mere statement of these facts carries with it the conviction that neither in law nor morals was the offer of the Denver company at that late date sufficient to justify the city council in rescinding, even if it had the power to do so. Waiving the question as to whether at- the time of this offer *372 the city was legally hound by the contract with Lacombe, it was unquestionably morally bound and under the highest obligations to carry its negotia-, tions to a final and complete conclusion. Upon the faith of its agreements, Lacombe had incurred an expenditure of nearly half a million dollars. We know of no law, and there is certainly no usage, which would approve, justify or require members of a city council acting in their representative capacity, unless in cases unlike this where they have no discretion, in ignoring and violating the rules of business morality and probity which prevail among individuals, and which the law in every instance seeks to encourage and uphold. It appears in the stipulation of facts that prior to the passage of the ordinance of 1900, the mayor and members of the city council conferred with the manager of the Denver company with reference to a reduction in rates charged the city for electric lighting, and were given to understand that the company was not prepared at that time to make any reduction. It further appears as an admitted fact, that since the commencement of this action, which was begun immediately upon the passage of the ordinance, the Denver company because of, and for the purpose of meeting the competition afforded by the defendant Lacombe, materially reduced its rates for commercial lighting, thereby certainly securing to the inhabitants of the city very material and substantial benefits. This of itself is in our opinion a sufficient answer to the argument that the contract in question was unnecessary.
Counsel on both sides have presented unusually able and exhaustive arguments, and to the proper solution of the questions raised we have given the most careful and thorough investigation. In our opinion the doctrines affirmed by us in Gas Company v. Leadville, supra, are on principle and in ef *373 feet directly applicable to and decisive of the controlling questions in this case, but we have thought proper by reason of the importance of this case to give them further and fuller consideration. We have not considered the objections of appellee seriatim, but in the course of this opinion we believe that we have touched and passed upon all. Our conclusion is that although they are pressed with much ingenuity and ability, they are without substantial merit. The contract was in our opinion a valid one, and the court erred in its judgment. This conclusion finally disposes of everything in the case, so that there will be nothing to be done by the trial court in the case, should it be remanded. There is no necessity, therefore, for this useless procedure, and judgment will be entered here in accordance with the views which we have expressed. It will be that the injunction be dissolved, that the defendants go hence without day, and that all costs be taxed against the appellee.

Reversed and Judgment Rendered for Appellants.